**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SLF HOLDINGS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **UNITI FIBER HOLDINGS, INC.; UNITI** | ) | **1:19-cv-00333** |
| **GROUP, INC.;** | ) | |
| **KENNETH  GUNDERMAN;  JOHN P.** | ) | |
| **FLETCHER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**COMPLAINT**

Plaintiff SLF Holdings, LLC ("SLF") brings this action against Uniti Fiber Holdings, Inc.,

Uniti Group, Inc., Kenneth Gunderman, and John P. Fletcher (collectively, the "Defendants").

**PARTIES, JURISDICTION, AND VENUE**

1.     Plaintiff SLF is a privately held limited liability company organized under the laws

of the State of Alabama.  No member of SLF is a resident or citizen of Arkansas, Maryland, or

Delaware.

2.     Defendant Uniti Group, Inc. ("Uniti") is a publicly-traded Maryland corporation

with its principal place of business in Little Rock, Arkansas (Ticker symbol UNIT).  Uniti was

formerly known as Communications Sales & Leasing Inc., or CS&L, until its name was changed

in 2017.  References herein to Uniti refer to CS&L before the name change.

3.     Defendant Uniti Fiber Holdings, Inc. ("Uniti Fiber"), a wholly-owned subsidiary

of Uniti, is a Delaware corporation with its principal place of business in Little Rock, Arkansas.

4.      Defendant Kenneth ("Kenny") Gunderman is a natural person who on information and belief is a citizen of Arkansas.

5.      Defendant John P. Fletcher is a natural person who on information and belief is a citizen of Arkansas.

6.      This Court has original jurisdiction over Counts I, II, III, IV, V, and VI pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367.

7.      This Court has original jurisdiction over Counts VII, VIII, IX, and X pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

8.      Venue is proper under 28 U.S.C. § 1391.  Further, venue is proper in this district pursuant to Section 27(a) of the Securities Exchange Act of 1934 because Defendants are found in, inhabit, or transact business in the Southern District of Alabama, and acts and transactions in violation of the federal and state securities laws as alleged in this Complaint have occurred within this district, among other places.

## INTRODUCTION

9.      This case involves complex and multifaceted financial fraud originally perpetrated by two telecommunications companies, Uniti and Uniti's former parent, and largest current customer, Windstream.[1]  Uniti (when it was known as CS&L) was a wholly-owned subsidiary of Windstream Holdings.   In 2015, as part of a pioneering endeavor to create the first

---

[1] "Windstream" generally and collectively refers to a publicly-traded holding company, Windstream Holdings, Inc. ("Windstream Holdings") and its subsidiaries.  Specific Windstream-entity names will be used when distinction is important or necessary.  Windstream Holdings was created in 2013 to serve as the publicly-traded holding company for all of the Windstream entities.  Before that, the publicly-traded parent entity was Windstream Corporation.  Windstream Corporation is now known as Windstream Services, LLC ("Windstream Services") and is a wholly-owned subsidiary of Windstream Holdings.  Windstream Services is itself a holding company, and its subsidiaries are the operating entities of Windstream (the "Windstream operating subsidiaries").

telecommunications real estate investment trust, Uniti was spun off from Windstream (the "2015 Uniti Spinoff").  Immediately following the spinoff, certain former Windstream directors and advisors who worked on the spinoff—including Kenny Gunderman, a former investment banker for Windstream and brother to Robert ("Bob") Gunderman, Windstream's then-Treasurer (and now CFO)—became Uniti's officers and directors.  Kenny Gunderman also became CEO of Uniti Fiber.

10.     In connection with the spinoff, the Windstream operating subsidiaries sold certain of their fiber and copper network assets to Uniti, and then Uniti leased those assets back to Windstream via a "Master Lease" agreement.  Under the Master Lease, Windstream became by far Uniti's largest customer, accounting for more than two-thirds of Uniti's annual revenues every year since the spinoff.  Ostensibly, the Master Lease was between Uniti and Windstream Holdings; but, in effect, the Windstream operating subsidiaries became the *de facto* lessees of the fiber and copper network assets, with exclusive control over the use of those assets.

11.     Following the 2015 Uniti Spinoff, Windstream and Uniti executives continued to tout the pioneering nature of the transactions, seeking professional prestige and financial gain from unwitting and unknowing investors.  One of those unsuspecting investors was Plaintiff SLF.  Before 2017, SLF owned Mobile, Alabama-based Southern Light, LLC ("Southern Light"), a fiber optic network provider.  In late 2016 and early 2017, SLF and Uniti engaged in negotiations for Uniti and/or Uniti Fiber to acquire SLF's membership interests in Southern Light.  In connection with those negotiations, Uniti and Kenny Gunderman initially offered an all-cash transaction, which was consistent with SLF's expressed preference, but later insisted that SLF accept a partial cash/partial stock transaction involving $65 million worth of the equivalent of shares of Uniti stock.  For tax reasons, Uniti offered membership interests in Uniti Group, LP, a limited

partnership for which Uniti is the general partner.  These interests are exchangeable into equal shares of Uniti stock (or their cash equivalent value, at Uniti's election).

12.     To induce SLF into accepting the exchangeable membership interests, rather than cash, Uniti and Kenny Gunderman touted, among other things, the 2015 Uniti Spinoff and sale leaseback transactions, and spoke in glowing terms about the Master Lease and Windstream's business.  But Uniti and Kenny Gunderman hid from SLF, just as they had hid from investors in their public filings and disclosures, the risk that the sale leaseback was prohibited by certain restrictive covenants in the financial instrument governing certain of Windstream's notes (the "Indenture").   In essence, those restrictive covenants prohibited Windstream's operating subsidiaries from selling Windstream's fiber and copper network assets to a third party—like Uniti—and then leasing those assets back.

13.     Windstream and Uniti had attempted to avoid the Indenture's restrictive covenants by having Windstream Holdings, rather than the Windstream operating subsidiaries, act as the ostensible lessee.  But Windstream and Uniti executives, including Kenny Gunderman, who helped orchestrate the spinoff and then became Uniti's first post-spinoff President and CEO, knew that the Windstream operating subsidiaries had represented to multiple state regulators pre-spinoff that they would be the lessees of the assets and exercised *de facto* control over the network assets post-spinoff, just as they had disclosed to the state regulators.  All of this exposed Windstream to a material risk that the transaction could be successfully challenged by Windstream noteholders in court—as it ultimately was.  Yet, neither Uniti nor Kenny Gunderman told SLF, or any other Uniti investor, that there was even a risk that such a challenge could occur.

14.     This information was critical.  If Windstream violated the restrictive covenants governing its notes (and a federal court in New York has found that it did), the noteholders could

accelerate the notes, obligating Windstream immediately to repay hundreds of millions of dollars. Such an acceleration would bankrupt (and has bankrupted) Windstream. A Windstream bankruptcy, and the possible ensuing rejection of the Master Lease, would have severe negative financial consequences for Uniti, including on Uniti's operating results and on its ability to access credit and satisfy its existing debt obligations. The risk that this could happen was well known to Uniti and Kenny Gunderman, but they never mentioned it, despite having a legal duty to disclose all material facts to investors, like SLF.

15. Uniti's acquisition of Southern Light closed on July 3, 2017. That day, Uniti Fiber acquired all of SLF's membership interests in Southern Light. Less than three months later, Uniti's fraud began to come to light. On September 21, 2017, the hedge fund Aurelius Capital Master, Ltd. ("Aurelius"), which had been buying the Windstream notes governed by the Indenture (the "Notes"), served a written notice upon Windstream that Windstream was in violation of the Indenture's restrictive covenants as a result of the 2015 Uniti Spinoff and sale-leaseback transactions. Shortly thereafter, Aurelius caused the trustee of the Notes, U.S. Bank National Association ("U.S. Bank"), to initiate breach of contract litigation against Windstream in the Southern District of New York, a case styled *U.S. Bank Nat'l Ass'n, as indenture trustee for Windstream Services, LLC's 6 3/8% Notes due 2023 v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, Case 1:17-cv-07857-JMF-GWG (the "Indenture Litigation").

16. The market reacted severely and negatively to Aurelius's notice of default (along with short positions Aurelius had been taking in Windstream in the weeks before serving the notice). Windstream's stock price understandably dropped dramatically. But so too did Uniti's, falling from $25.26 on July 3, 2017 to $14.60 by September 29, 2017, a decline of over 42%.

17.     Uniti was noticeably silent for nearly six weeks following the notice of default.  But when Uniti finally spoke, rather than coming clean, it attempted to continue to perpetuate the fraud. Even though the risk of a Windstream default was now known by the market, Uniti downplayed the magnitude of that risk.  At a November 7, 2017 investor conference, Kenny Gunderman assured the market that the risk of a Windstream default would never materialize: "We've looked very, very closely at the legal claim, and we're very confident that the legal arguments are on Windstream's side.  So [we] think that that's going to resolve itself."

18.     The situation, however, did not "resolve itself" favorably for Windstream and Uniti. On February 15, 2019, United States District Court Judge Jesse Furman entered Findings of Fact and Conclusions of Law in the Indenture Litigation.  He ruled that the 2015 Uniti Spinoff and the associated sale-leaseback transaction violated the Indenture governing the Notes.

19.     As a result of this "Event of Default," more than $300 million of Notes were accelerated and deemed immediately due and payable.  Ten days later, Windstream Holdings, Uniti's largest customer, filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York.  The ongoing effect and aftershocks of Windstream's bankruptcy have also caused Uniti's stock to plummet—to the point that Uniti itself is currently at risk of bankruptcy, potentially wiping out all of SLF's $65 million investment.  Uniti's stock traded at $9.29 as of market closing on July 2, 2019.

## FACTUAL ALLEGATIONS

## I.     Spinoff and Sale-Leaseback Transaction

### Uniti Spinoff Origins and Key Players

20.     The roots of the 2015 Uniti Spinoff date back to 2012.  At that time, Windstream was a telecommunications company headquartered in Little Rock, Arkansas.  For many years

before 2012, Windstream Corporation worked regularly with Stephens Inc. ("Stephens"), a privately held investment banking/financial services firm also headquartered in Little Rock. Defendant Kenny Gunderman was then working at Stephens, having left Lehman Brothers' New York office a few years earlier.  Before 2012, Kenny Gunderman, through his various roles as senior telecom investment banker, executive vice president, and co-head of investment banking for Stephens, came to know Windstream well.

21.     In fact, for years before 2012, Kenny Gunderman and Windstream had discussed the concept of spinning Windstream's fiber and copper network into a publicly-traded real estate investment trust ("REIT").  As they conceived it, the REIT structure would increase Windstream's financial flexibility, improve its tax flow and cash flow efficiency, and, notably, attract outside investment.

22.     But a lightbulb moment came in late 2012 when a casino/gaming facility announced its intentions to separate its gaming operating assets and real property assets into two tax-free, publicly-traded real estate investments trusts.  Kenny Gunderman and Windstream were excited about the prospect of pioneering the first REIT created from a fiber and copper network.

23.     At that point, Kenny Gunderman started serving as "lead adviser relationship person" at Stephens with respect to Windstream's proposed spinoff transaction.  Stephens and Kenny Gunderman were handsomely paid for this work, with Windstream paying Stephens over a million dollars in fees.  Kenny Gunderman eventually left Stephens right before the spinoff to become Uniti's first post-spinoff President and CEO.  He still serves in both positions today, and he is well compensated for his work: according to Uniti's annual proxy filings, Gunderman has received over $5 million in compensation every year since the spinoff.

24.     Windstream tapped its General Counsel, Defendant John Fletcher, to direct and implement Windstream's legal and regulatory strategy for the proposed REIT spinoff transaction. At all relevant times leading up to the spinoff, which eventually resulted in Uniti holding assets formerly owned by Windstream, Fletcher served as General Counsel of both Windstream and Uniti.

25.     Windstream's then-CFO, Tony Thomas, was intimately involved in all parts of planning, preparation, and implementation of the spinoff.  Until a few months before the spinoff, Thomas also served as Uniti's President and CEO.  On December 11, 2014, Thomas was named CEO of Windstream, a position he still holds today.

26.     To gain "greater flexibility with respect to future strategic actions," on August 30, 2013, Services approved the formation of a new parent company, Windstream Holdings, Inc. Through the creation of this new holding company structure, Windstream Corporation, the previous publicly-traded company, became a wholly-owned subsidiary of the new publicly-traded parent company, Windstream Holdings.  Windstream Holdings ultimately leased the assets back from Uniti post-spinoff.

27.     Uniti, then known as Communications Sales & Leasing, Inc., was incorporated as a wholly-owned subsidiary of Windstream in the state of Delaware in February 2014 and reorganized in the state of Maryland in September 2014.  From the date of its incorporation until after the spinoff, Uniti management was dominated by Windstream executives and former Windstream advisors.

### Structural Spinoff Issues

28.     As a telecommunications company, Windstream is regulated by both state and federal authorities.  Those regulators posed a potential hurdle to the 2015 Uniti Spinoff because

Windstream was selling off the very telecommunications infrastructure it used to serve its customers.  Three fundamental problems had to be addressed from the outset:

(a)     First, Windstream had over $8 billion of long-term debt, including at least $700 million in outstanding Notes, and the agreements governing the debt, including the Indenture governing the Notes, restricted what sort of transactions Windstream could undertake.  Such restrictive covenants are customary; they provide lenders/noteholders with assurance that a company will not undertake fundamental changes to its core business, or sell off material assets outside of the ordinary course of business, or take other actions that might put repayment at greater risk than bargained for by the lenders/noteholders.

(b)     Second, Windstream had to obtain state regulatory approvals.  Many states, including Alabama, regulate telecommunications companies like Windstream as a utility. State public service commissions, charged with protecting their citizens, regulate certain telecom infrastructure transfers because states want to verify that their most vulnerable, at-risk citizens have reliable, uninterrupted access to telephone services.

(c)     Finally, Windstream would need, post-spinoff, the ability to access, control, and use the assets.  Otherwise, it could not operate its core business or meet its regulatory obligations.  Windstream was not considering a change to its core business; it was considering moving its assets into a new entity and then using those assets.  It was always an understood and stated requirement that Windstream would not and could not lose the right to use and operate the assets transferred to the REIT.

Each of these issues had to be successfully addressed before the spinoff could happen.

## Note Restrictions

29.     One possible way to effectuate an asset spinoff that would still give Windstream legal access to the assets would be to have Windstream sell its assets to the REIT and

simultaneously enter into a long-term leaseback agreement providing Windstream access to the assets.   While this solution would satisfy regulatory concerns, the Indenture governing Windstream's Notes would not allow it.

30.    Specifically, the Indenture prohibited Windstream Corporation (which was the Windstream parent at the time the Indenture was executed) from entering, or permitting certain of its subsidiaries (including the Windstream operating subsidiaries) to enter, into a "Sale and Leaseback Transaction," absent certain inapplicable exceptions.  In particular, Section 4.19 of the Indenture provides:

> Sale and Leaseback Transactions.
>
> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction.

The "Company" was defined in the Indenture as "Windstream Corporation."  And Windstream conceded in the Indenture Litigation that "Restricted Subsidiaries" was defined to include the Windstream operating subsidiaries.

31.    The Indenture then defines a "**Sale and Leaseback Transaction**" as:

> any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred. [2]

A sale of the telecom infrastructure assets to Uniti, followed by a leaseback of those same assets, would be a clear violation of this provision in the Indenture.

---

[2] "Person" was defined broadly to include "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity."

32.     This hurdle was identified early on by Windstream's then-CFO, Tony Thomas. In an April 15, 2013 email to Bob Gunderman, Thomas wrote:

> Here are some questions I have related to the Captive… We need a capital structure that works with the [note] Indenture; we may be able to use the HoldCo strategy here. Create HoldCo and put Windstream Financial underneath HoldCo… Remember, the sales – leaseback provision in the indenture can be a limited factor here.

33.     Thomas' idea "to use the HoldCo strategy here" was his attempt to get around the Indenture's prohibition against the Windstream operating subsidiaries selling their assets to Uniti and leasing them back so that they could keep using them. Instead, Windstream would (i) create a new holding company (Windstream Holdings) that would own Windstream Corporation and all other Windstream entities as subsidiaries; (ii) cause the Windstream operating subsidiaries to sell their fiber and copper network assets to a REIT entity ("the Captive" in Thomas' email; in other words, Uniti), and then (iii) have Windstream Holdings, which is not a party to the Indenture and was not covered by the restrictive covenants, lease the assets back from Uniti. But then there had to be one more step, because the holding company did not have any operations, and the Windstream operating subsidiaries that needed access to the assets were all prohibited by the Indenture from leasing back the assets.

34.     The actions and statements directed at this last step—*i.e.*, getting use of the assets back to the operating subsidiaries—led Windstream, Thomas, Fletcher, Bob Gunderman, and Kenny Gunderman to extend two incompatible narratives for two different groups. One story would be told for the financial markets and a different one for the state regulatory agencies.

35.     Windstream's Board ultimately approved the "HoldCo" structure alluded to in Thomas's April 15, 2013, email, and through the planning, preparation, actions, directions, and decisions of its agents, consultants, and executives, including but not limited to Bob Gunderman,

Kenny Gunderman, Fletcher, and Thomas, in August 2013, Windstream Holdings was created to serve as the HoldCo.

## **State Regulatory Approvals**

36.     Between July and December of 2014, Windstream worked on the second hurdle: convincing state regulators that the proposed transaction would not put Windstream's customers' service at risk.  John Fletcher, the point man on the regulatory approval process, understood the purpose of these approvals.  For example, when asked at trial in the Indenture Litigation about Uniti's application to the Alabama Public Service Commission ("PSC"), Fletcher testified:

> Q.     Now, at the time of [the Alabama PSC] application, you understood that the regulators were focused on whether [Windstream's operating subsidiaries] would be able to continue to operate and discharge their regulatory obligations after they transferred their assets, correct?
>
> A.     Correct.
>
> ….
>
> Q.     And you understood that one of the reasons for that concern was that [Uniti], which was becoming the owner of the assets, was not a regulated entity, is that correct?
>
> A.     Which entity?
>
> Q.     CSL [Uniti].
>
> A.     That was one of the questions of these proceedings, as to whether it should become a regulated entity.
>
> Q.     Am I correct that at the time of these proceedings, CSL [Uniti] was not a regulated entity?
>
> A.     Correct.
>
> …
>
> Q.     And when you told the regulatory authorities in Alabama that [Windstream's operating subsidiaries] would be leasing back the transferred assets, you were directly addressing what the regulators were focused on, is that correct?

A.      I'm not sure I can answer. I don't know exactly what they were focused on in each jurisdiction.

Q.      Would you agree that, in general, the regulators were focused on whether the transferor subsidiaries would be able to continue to operate and discharge their regulatory requirements?

A.      Yes.

Q.      And am I correct that by telling the regulatory authorities in Alabama that the [Windstream operating subsidiaries] would be leasing back the transferred assets, you were providing the assurance that they would be able to continue to operate and discharge their regulatory requirements, correct?

A.      I wouldn't use the word "assurance," but it was relevant to that concern.

37.      In short, Windstream, Fletcher, and Thomas, along with Bob Gunderman, Kenny's brother and Windstream's Treasurer, told regulators, including the Alabama PSC, that the Windstream operating subsidiaries would have uninterrupted access to the critical assets through a simple sale-leaseback transaction.  John Fletcher, who simultaneously was assuring potential investors that Windstream Holdings would be the lessee of the critical assets, and studiously omitting any disclosure to investors that the Windstream operating subsidiaries were acting as the *de facto* lessees, took the lead.

38.      Throughout 2014, Fletcher, acting as General Counsel for both Windstream and Uniti, and with the knowledge, support, and approval of Windstream officers and directors, drafted, reviewed, and signed various applications, affidavits, and other regulatory documents designed to convince at least nine state utility regulatory bodies that they should approve Windstream's sale of the assets.  The rationale for approval: the Windstream operating subsidiaries effectively would lease the assets back and retain exclusive, long-term access to and control of them.  One of these documents that Fletcher drafted and signed, on behalf of Uniti and Windstream, was the application to the Alabama PSC, which was filed in Montgomery, Alabama on July 31, 2014.  Kenny Gunderman, who worked closely with Windstream in developing and

implementing the spinoff and sale-leaseback plan, was fully aware of Windstream's messaging about the transaction to state regulators.

39.     One state regulator, the Kentucky PSC, required that Windstream provide live testimony, subject to cross-examination, before approving Windstream's application.  During the November 13, 2014 hearing before the Kentucky PSC, Bob Gunderman admitted that although Windstream Holdings would be the signatory to the lease, the Windstream operating subsidiaries were the true parties in interest.  When asked whether "there [will] be an agreement between the Kentucky [operating subsidiaries] and [Uniti]," Bob Gunderman replied: "The agreement will be between CS&L at the corporate entity level as well as Windstream Holdings, Inc., and it's just for administrative ease in terms of transacting … the lease between the entities … for the benefit of the operating subsidiaries."

40.     At the same time that Fletcher, Bob Gunderman, and others were telling regulators like the Alabama PSC that the Windstream operating subsidiaries would retain a leasehold right to access the assets, they knew that the structure he was describing to them was a direct violation of the Indenture.  As Fletcher testified during the Indenture Litigation:

> Q.     The question is, at the time that this transaction was being planned, you were aware that if the transferor subsidiaries [i.e., the Windstream operating subsidiaries] signed the master lease, that would have been a clear violation of the indenture at issue in this case.
>
> A.     Yes.

41.     Yet during the November 2014 hearing, Bob Gunderman, affirmatively told Kentucky regulators that the contemplated spinoff and lease transaction would *not* violate any of Windstream's debt agreements or restrictive covenants.  He explained that "[a]s part of this transaction, [Windstream] ha[d] no concerns with any covenants within [its] indentures or [its] existing credit agreement."

42.     Windstream's scheme, adopted and implemented by Fletcher, Thomas, Bob Gunderman, and Kenny Gunderman, touting the structure to investors, while simultaneously trumpeting the safety, comfort, and simplicity of a direct Windstream sale-leaseback structure to state regulators, succeeded initially.

## Completion of the Spinoff

43.     Windstream's third hurdle, ensuring that its operating subsidiaries had access to the assets post-spinoff, was addressed internally.  Fletcher, Thomas, and Kenny Gunderman began working on the Master Lease to be signed by Windstream Holdings and Uniti at or immediately before closing the spinoff.  At all relevant times during the "negotiation" of the Master Lease, the officers of Windstream Holdings were also officers of Uniti.  Thus, the Master Lease was, in effect, negotiated, drafted, finalized, and even signed, solely by Windstream officers.

44.     The Windstream operating subsidiaries are not parties to the lease, even though Fletcher, Thomas, and Bob Gunderman had told state regulators that the Windstream operating subsidiaries would be leasing the assets.  The operating subsidiaries could not execute the lease because that would be a clear violation of the Indenture.  Nevertheless, at all times, the operating subsidiaries would use the assets and pay all rent costs required under the lease.  Ultimately, Uniti would only receive payment from Windstream Holdings if the operating subsidiaries made payments to Windstream Holdings.

45.     Having settled on the creation of Windstream Holdings and the use of Uniti as "Captive," Windstream proceeded to seek board approval without going through the process of seeking consents or waivers from Windstream noteholders.  On August 6, 2014, Windstream's Vice President of Capital Markets and Investor Relations, sent an email to Tony Thomas, Bob Gunderman, and John Fletcher, among others.  Michael's email reveals Windstream's strategy to avoid getting into details surrounding the structure's impact on the Notes:

We do not believe that the Windstream indentures require any consents or waivers to effect the transaction (do not go into detail unless specifically asked on each point) . . . .  If pressed on sale-leaseback provision: Given that the lease is being implemented at Windstream Holdings, it does not impact any covenants in the Windstream indentures, including the sale-leaseback provisions.

46.    On March 25, 2015, the Windstream Board approved the 2015 Uniti Spinoff.  Thus, the pieces were in place to attempt to get around the restrictive covenants in the Indenture in the following way:  Windstream Corporation (now known as Windstream Services), which had borrowed billions of dollars in exchange for promising (in part) not to sell and leaseback its assets, would cause its operating subsidiaries to sell their assets to Uniti; Windstream Holdings, not directly restricted by the Indenture, would lease the assets from Uniti under the Master Lease; Windstream Services and the Windstream operating subsidiaries would use the assets and make payments to Windstream Holdings; and Windstream Holdings would make payments to Uniti under the Master Lease.  Because Uniti and Windstream shared officers at this time, and because Uniti's new CEO Kenny Gunderman had been Windstream's financial adviser during this transaction, Uniti knew, should have known, or recklessly disregarded the fact that there was at least a risk that this house of cards would tumble if challenged by Windstream noteholders.

47.    The Master Lease was signed in April 2015 by Kenny Gunderman on behalf of Uniti and by Thomas on behalf of Windstream.  In it, each party represents to the other that the lease does not constitute a material breach of any other agreement of such party.  This representation, when made, was false.  Kenny Gunderman and Thomas knew, should have known, or were recklessly indifferent to that fact at the time the lease was signed.

48.    The Master Lease also included several events of default, including (i) if any of the representations or warranties made by Windstream Holdings in the Master Lease proves to be untrue when made in any material respect and (ii) if any event or condition occurs that enables or permits holders of any material indebtedness (over $ 75 million) to cause that indebtedness to

16

become due prior to its scheduled maturity. These defaults were triggered at the moment the lease was signed and delivered.  Kenny Gunderman and Thomas knew, should have known, or were recklessly indifferent to that fact at the time the Master Lease was signed.

49.     In the same way, Windstream and Uniti knew when the Master Lease was signed that how Windstream and Uniti characterized the sale-leaseback arrangement to state regulators described a direct violation of the Indenture's restrictive covenants prohibiting sale-leaseback transactions.  After all, Fletcher and other officers of both Windstream and Uniti signed, on behalf of Uniti and Windstream, nearly all the state regulatory filings that had described the spinoff as a sale-leaseback transaction.

50.     Uniti leadership knew of the potential issues associated with the 2015 Uniti Spinoff. Kenny Gunderman, Uniti's President and CEO, served as a financial advisor to Services before the spinoff and has publicly taken credit for crafting the spinoff transaction.  Kenny Gunderman, by virtue of his positions at Uniti, certifies Uniti's SEC filings.

51.     John Fletcher has admitted that Windstream Holdings was the only Windstream entity to sign the Master Lease because Windstream sought to avoid "a clear violation" of the Indenture.   In other words, Windstream's General Counsel—and Uniti's former General Counsel—has acknowledged that Uniti knew that the spinoff and the Master Lease were at risk of violating the Indenture.  Having Windstream Holdings be the only Windstream entity to sign the Master Lease was an attempt to hide these risks.

52.     Then, at or about the time Uniti was spun off, Windstream and Uniti systematically set about to remove the main direct-knowledge participants of the fraudulent behavior used to obtain REIT approval from regulators and financial markets.  Key players in the scheme, such as Fletcher and Thomas, were removed from their positions at Uniti and employed (or re-employed,

as the case may be) solely by Windstream.  Thomas was removed as President of Uniti and replaced with Kenny Gunderman.  Fletcher was removed as General Counsel at Uniti and replaced by Daniel Heard.

53.     While Uniti had finally gotten itself up and running, Windstream was at this point its only customer, presenting Uniti with a different issue of financial stability.  Uniti knew, and the financial markets insisted, that it immediately needed to diversify its revenue stream.  Also, because Windstream operated its own assets, and Uniti was really only a leasing company for assets it did not operate or even know how to operate, Uniti needed a management team that was capable of actually operating a telecom business.

**II.     Uniti makes material public false and misleading statements about Windstream.**

54.     Following the spinoff, Uniti made a series of public false and misleading statements about Windstream, the spinoff, and the sale-leaseback in its public disclosures, that studiously and misleadingly avoided disclosing the risk that the sale-leaseback violated Windstream's Indenture.

55.     For example, Uniti's initial Information Statement describing the spinoff to shareholders was attached to a Form 8-K signed by Kenny Gunderman as Uniti's first post-spinoff President and CEO, and filed with the SEC on March 26, 2015.  In it, Uniti explained that after the spinoff, "the Distribution Systems," *i.e.*, the copper and fiber network assets Uniti acquired from the Windstream operating subsidiaries, "will be leased to *Windstream Holdings*" pursuant to the Master Lease.

56.     This statement, however, was false or misleading.  Uniti made no mention of the fact that it had told state regulators that the operating subsidiaries would have leasehold access to the assets, or that the Master Lease arrangement—wherein Windstream Holdings was the

ostensible lessee, but the Windstream operating subsidiaries were the *de facto* lessees—violated the Indenture.

57.    Later in the Information Statement, Uniti disclosed the fact that the structure of the spinoff and arrangement had been affected by certain of Windstream's restrictive covenants in its debt agreements.   Specifically, Uniti disclosed that due to restrictive covenants in its debt agreements, Windstream had retained ownership of some of its copper and fiber network assets, and had not sold those assets to Uniti:

> In order to comply with restrictions under Windstream's debt agreements and to minimize the number of states in which regulatory approvals of the Spin-Off were required, Windstream will retain ownership of certain distribution systems in select states. Windstream will continue to operate the distribution systems that it owns and those that it leases from parties other than CS&L. Windstream has selected assets for inclusion in the Spin-Off which it believes provide CS&L with sufficient scale and geographic diversity to meet the business purposes for the Spin-Off described above under "Reasons for the Spin-Off."

58.    This disclosure was false or misleading.   The restrictive covenants to which this disclosure refers were not the Indenture's prohibition on sale-leaseback transactions under Section 4.19.   Instead, they were other restrictive covenants, such as the "Restricted Payment" covenant under Section 4.07, the Mergers covenant under Section 5.01, and the Change of Control covenant under Section 4.14.   By disclosing the effect of certain of the Indenture's restrictive covenants on the deal structure, without even mentioning Section 4.19's prohibition on sale-leaseback transactions involving the Windstream operating subsidiaries, Uniti misleadingly obscured the risk that the spinoff and sale-leaseback could have violated Section 4.19.

59.    Indeed, at the time of the spinoff and sale-leaseback, the market was entirely unaware of this risk, as reflected in an August 13, 2014 report by Covenant Review titled "Windstream: How Would the Bond Covenants be Implicated by the Proposed REIT Spin-Off." In that report, Covenant Review analyzed the likelihood that the spinoff would result in a violation

of the restrictive covenants found in Section 4.07 (Restricted Payments), Section 4.14 (Change of Control), and Section 5.01) (Merger) of the Indenture.  But the analyst was unaware even of the possibility that Section 4.19's prohibition on sale-leaseback transactions could be violated, because that risk was not disclosed.

60.     In the Information Statement, Uniti also acknowledged in its disclosure of risk factors that it was dependent on Windstream's financial performance.  It stated:  "We will be dependent on Windstream Holdings to make payments to us under the Master Lease, and an event that materially and adversely affects Windstream's business, financial position or results of operations could materially and adversely affect our business, financial position or results of operations."

61.     But this statement was also false or misleading, because Uniti failed to disclose that a sequence of events had already occurred that posed an existential threat to Windstream's business, financial position, and results of operations: the sale-leaseback transaction, which was prohibited by Windstream's Indenture.

62.     Finally, Uniti publicly extolled the financial *stability* of Windstream, without cautioning about the risk that the sale-leaseback transaction would be found to violate the Indenture and the threat that risk posed to Windstream's business.  In the same public filing, under the heading "Financially Secure Tenant" in the Information Statement, Uniti stated: "Immediately following the Spin-Off, Windstream will be our only tenant. … For the year ended December 31, 2014, Windstream generated annual revenue of approximately $5.8 billion and net cash from operations of $1.5 billion. Windstream's liquidity position, modest leverage and ability to generate significant free cash flow should provide it with the ability to pay the annual lease obligations to CS&L [*i.e.*, Uniti] for the foreseeable future."

20

63.     This statement was also false or misleading.  Uniti did not publicly state (or later disclose to SLF) that (at least some of) its leaders knew, should have known, or were recklessly indifferent to the fact that there was a risk that Windstream was already in violation of the Indenture, putting Windstream's (and Uniti's) continued viability in jeopardy.  On the contrary, Uniti's public statements following the spinoff continued to tout Windstream's financial stability, without mentioning the risk that the entire sale-leaseback arrangement could be a breach of the Indenture's restrictive covenants.

64.     All of the foregoing false or misleading statements from Uniti's initial Information Statement were also contained in earlier iterations of the Information Statement, which were filed with the SEC as attachments to: (1) a Form 10 filed by Uniti on October 24, 2014, and signed by Thomas as CEO of Uniti; (2) Amendment No. 1 to the Form 10 filed on December 22, 2014, and signed by Fletcher as General Counsel of Uniti; and (3) Amendment No. 2 to the Form 10 filed on February 10, 2015, and also signed by Fletcher.

65.     Moreover, Uniti's false and misleading characterization of the Master Lease and its relationship with Windstream, as well as Uniti's overstated confidence in Windstream's financial condition, continued well after the transactions were complete.  For example in its Form 10-K for Fiscal Year 2017, which was signed by Kenny Gunderman and filed on February 23, 2017, Uniti misleadingly characterized Windstream Holdings as the "lessee of the Distribution Systems pursuant to the Master Lease," without disclosing that the Windstream operating subsidiaries were the *de facto* lessees, just as Uniti had admitted to state regulators, and without disclosing even the risk that Windstream violated the Indenture.

66.     In Uniti's Q3 2016 Earnings Call on November 14, 2016, Kenny Gunderman explained that Uniti would be more than willing to consider engaging in "***additional sale-***

*leaseback options* with Windstream." This disclosure of Uniti's willingness to consider additional sale-leaseback options misleadingly implied that there was no legal risk that such "sale-leaseback options" could be prohibited by the Indenture's restrictive covenants, and misleadingly implied the same as to the spinoff and sale leaseback that occurred in 2015.

67.     In Uniti's Q4 2016 Earnings Call on Feb. 23, 2017, Mark Wallace, Uniti's CFO and Treasurer, stated that Uniti was "extremely pleased with Windstream's performance" and acquisitions, but misleadingly failed to mention the risk that Windstream was in violation of the Indenture's restrictive covenant.

68.     And at a JPMorgan Investor Event on May 24, 2017, in response to a question about the volatility of Windstream's stock price, Mark Wallace touted Windstream's viability: "[W]e have a lot of confidence in Windstream. I think the management team has done a great job over the last couple of years since our spin-off. And whether it's selling assets or restructuring their debt or repricing their debt and taking cost out of the business. And as I understand it, they continue to seek to take costs out of the business. And I think the acquisitions that they've announced, both EarthLink and [Broadview], will be accretive and enhancing for them, which is actually very good for us. So anytime that the financial profile of Windstream improves and the cash flow improves and the credit profile improves, that's certainly good news for us. And I suspect that, that will continue to happen as they realize synergies, those acquisitions continue to produce the returns that they're expecting and they -- and Tony continues to take the interconnection cost out of the business as well."

69.     All of these statements touting Windstream's financial stability and expressing a preference by Uniti to engage in more sale-leaseback arrangements with Windstream were

misleading because they failed to disclose the threat that Windstream's breach of the Indenture posed to its ability to operate as a going concern.

70.     These false and misleading statements and omissions were certainly material to investors.  As Uniti knew, its value was heavily dependent on revenue from Windstream.  In fact, since the spinoff, Windstream has accounted for at least two-thirds of Uniti's annual revenue. Before the completion of the Southern Light sale, Uniti filed its Form 10-K for the year-ended December 31, 2016 on February 23, 2017.  In the 10-K, Uniti highlighted the risks that Windstream represented a significant portion of its business and that Uniti's success depended significantly on the viability of Windstream.   Uniti made numerous statements about the importance of Windstream, which it described as its "anchor tenant" that "provide[d] [Uniti] with a base of stable and highly predictable rent revenues as an initial platform for us to grow and diversify our portfolio and tenant base."  Uniti also acknowledged its "dependen[ce] on Windstream Holdings to make payments to us under the Master Lease, and an event that materially and adversely affects Windstream's business, financial position or results of operations could materially and adversely affect our business, financial position or results of operations."

71.     Uniti further disclosed, pursuant to Item 303 of Regulation S-K, that because Windstream represented a substantial portion of Uniti's revenue, Uniti "monitor[ed] the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments."  But Uniti did not disclose to investors the biggest

risk of all to Windstream's credit profile: the risk that Windstream was in default of the Indenture's restrictive covenants as a result of the Master Lease.

72.     Uniti's internal discussions show the misleading nature of its public statements.  In sharp contrast to Uniti's public statements, Windstream was so concerned internally about the propriety of this transaction that, on or about April 12, 2015, Windstream CFO and Treasurer Bob Gunderman circulated to his brother Kenny Gunderman, and others, talking points to address how the Master Lease and the Windstream relationship should be publicly discussed.  In that email, Bob Gunderman explained that Kenny Gunderman, Uniti's President and CEO, would "reinforce the message" to "holdout[ ]" accounts about the 2015 Uniti Spinoff.  Those talking points advised, for example, a certain response to the question "[w]hy is the lease with WIN Holdings VS WIN Services?"  If asked that question, the talking points directed Kenny Gunderman and Windstream's executives to obfuscate the truth: "[t]his is a complex transaction and after considering many factors we concluded that having the lease at WIN Holdings was the best structure."  And "[i]f pressed," they were only to identify "[f]actors evaluated," including "corporate structure, tax, accounting, [and] debt."  This was consistent with Windstream's earlier strategy, reflected in Windstream's Vice President of Capital Markets and Investor Relations's August 6, 2014 email, for the entities to avoid getting into details surrounding the structure's impact on Windstream's Notes.

73.     And absent from those talking points was the true reason for having the "HoldCo" structure—a fraudulent attempt to avoid a "clear violation" of the Indenture.  At the time of the spinoff, Windstream and Uniti executives knew of the steps that had been taken to obfuscate the risk that the spinoff and Master Lease structure violated the Indenture's restrictive covenants.  In their public statements, Uniti executives failed to disclose their knowledge that the 2015 Uniti

spinoff and sale-leaseback transaction violated, or risked violating, the Indenture's restrictive covenants.

74.     Windstream certainly did not encourage Kenny Gunderman or Windstream's representatives to disclose these facts—even "if pressed" about the reasons that Windstream Holdings, a non-operating holding company, had signed the Master Lease instead of Services.

## III.   Uniti induces SLF to purchase stock through its acquisition of Southern Light.

### Southern Light Network and Operations

75.     Mobile, Alabama-based Southern Light was formed in 1998.  By mid-2016, it owned a regional fiber network across the Gulf Coast comprising nearly 540,000 fiber strand miles and employed hundreds of people in the Mobile area.  Around that same time, telecommunication consolidation was heating up.  As a result, in mid-2016 Southern Light's sole owner, SLF, decided it would test the market to see if anyone would be interested in purchasing its operating subsidiary, Southern Light.

76.     On or around October 14, 2016, SLF had a preliminary meeting with Uniti (which, for the entirety of the negotiations, was negotiating and making representations on its own behalf and on behalf of Uniti Fiber).  This meeting was an informational session about Uniti, discussing its history, background, and structure.  The 2015 Uniti Spinoff came up during that and subsequent discussions in which Uniti representatives touted the REIT and spinoff as a cutting-edge transaction that uniquely positioned Uniti as an industry thought leader.  Uniti management, and in particular Kenny Gunderman (who also was representing Uniti Fiber in his negotiations with and representations to SLF), also noted that the REIT structure was important because the employees who knew how to operate telecommunications infrastructure remained at Windstream.

As a result, there was a significant gap that Uniti needed to fill with a true telecommunications management team (in addition to Uniti's existing REIT management team).

77.     Although Uniti touted the benefits of the 2015 Uniti Spinoff to lure SLF to accept Uniti stock during the sale of Southern Light, it wrongfully withheld and omitted important facts, such as that (i) the Windstream operating subsidiaries were in violation of the Indenture, (ii) Uniti knew of the risk that the earlier spinoff and signing of the Master Lease had violated the Indenture; (iii) the Master Lease contained a material misrepresentation and Windstream was in default under it at signing, and (iv) Windstream and Uniti had disclosed to state regulators that, although Windstream Holdings was the nominal signatory to the Master Lease, the Windstream operating subsidiaries would be the *de facto* lessees under the Master Lease, while disclosing to the market just the opposite.

78.     Uniti sent an initial bid to Southern Light on November 3, 2016, but they were not selected.  After some initial diligence, that original deal was unable to close within a 30-day exclusivity period.  Uniti, which had expressed its disappointment in November that it was not selected its initial bid, reached out to SLF in mid-November 2016 to check on the status of the originally selected bid.  In mid-December 2016 when the exclusivity period with the original bidder was over, SLF told Uniti that it would entertain a new or higher bid.  SLF insisted, however, that the bid needed to be all cash.  SLF's Lee Wallace confirmed to Uniti's Kenny Gunderman the all-cash preference in an email on December 19, 2016.

79.     At that time, and over the next few weeks, Kenny Gunderman endeavored to persuade SLF that stock should be part of the transaction.  In particular, Uniti wanted SLF to accept membership interests in Uniti Group LP.  The membership interests in Uniti Group LP would be exchangeable by SLF on a 1:1 basis for shares of Uniti Group, Inc. common stock or their cash

equivalent value, at the election of Uniti.  Membership interests in Uniti Group LP thus would have the same value as shares of Uniti Group, Inc. common stock.

80.     On December 20, 2016, Kenny Gunderman, as President of Uniti, acknowledged that he "underst[ood]" SLF's request for an all-cash deal but countered that he "like[d] having stock in the deal because it ma[de] [him] feel better about the diligence process given there is some shared interest."  A partial-stock deal instead of an all-cash transaction, Kenny Gunderman insisted over the course of negotiations, would also (i) free cash for other acquisitions that Uniti needed to make; (ii) provide general deal comfort to Uniti and its investors; and (iii) send a strong public message to the broader financial markets about SLF's faith in Uniti.

81.     For a few weeks thereafter, SLF worked in good faith with Uniti and Kenny Gunderman to brainstorm ways to include stock consideration that could also address Uniti's cash, investor, and market concerns, while simultaneously meeting SLF's reasoning for all cash—it wanted to avoid Uniti market risk post-closing.  For example, SLF suggested in early January that it would consider taking a high percentage of stock if that stock could be sold by SLF at or immediately after the closing.  SLF also suggested at that time that it would consider taking stock if it also received the contractual right to sell that stock to another at a set price (*i.e.*, if it could get a put option).  Uniti, however, rejected any and all of these same-as-cash type proposals and started insisting that the stock would have to be held for a certain period of time after closing to truly satisfy Uniti's needs, including its cash and market-message needs.  During all of these discussions, and despite Uniti's and Kenny Gunderman's knowledge that SLF was trying to avoid Uniti market risk, they never disclosed Uniti's biggest market risk, the Windstream bond covenants' prohibition on sale-leaseback transactions.

82.     Through various terms sheets and proposals that were circulated between December 20, 2016 and January 12, 2017, Uniti and SLF were unable to find a mutually acceptable stock consideration arrangement.   On January 12, 2017, SLF circulated the first draft purchase agreement to Uniti.  That document continued to reflect SLF's position that consideration for the acquisition should be all-cash. Over the next several months, through the purchase agreement drafting process, Uniti responded and continued to push stock consideration.  In those multiple turns of the Purchase Agreement, Uniti never disclosed the risk that Windstream could default on its Notes.

83.     While other terms of the Purchase Agreement were being negotiated through document turns, SLF decided to temporarily table the partial-stock discussions with Uniti and started to perform due diligence related to Uniti's stock to determine whether it was willing to accept Uniti market risk.  Uniti knew that the company's value was heavily dependent on revenue from Windstream.  Indeed, at the time of these negotiations, approximately 80% of Uniti's revenue came from Windstream, so any "event that materially and adversely affect[ed] Windstream's business, financial position or results of operations could materially and adversely affect our business, financial position or results of operations."  Uniti's public filings disclosed certain risks to Windstream's credit profile.  But as discussed above, Uniti's public statements did not disclose the biggest risk of all: that Windstream was in default of the Indenture's restrictive covenants as a result of the Master Lease.

84.     Nor did Uniti disclose that risk to SLF at any point during the parties' negotiations. Despite its knowledge that Windstream was, or at least potentially was, in violation of the Indenture and that Windstream, as Uniti's largest customer, was the greatest driver of the value of Uniti Group, Inc.'s common stock, Uniti failed to disclose any facts about those material risks to

SLF—even as Uniti's Kenny Gunderman actively encouraged SLF to accept Uniti stock equivalents, instead of SLF's preferred all-cash transaction.

85.     Unaware of the material risks that the 2015 spinoff and signing of the Master Lease violated the Indenture, and unaware that the Windstream operating subsidiaries were therefore at risk of the acceleration of hundreds of millions of dollars of notes, SLF ultimately agreed to accept $65 million of its overall consideration in Uniti stock equivalents.

86.     On April 7, 2017, SLF signed a Membership Interests Purchase Agreement ("Purchase Agreement"), whereby Uniti would acquire SLF's assets in exchange for approximately $635 million in cash and $65 million in Uniti stock equivalents (the "2017 Transaction").

87.     SLF would not have agreed to accept payment in Uniti stock equivalents had Uniti disclosed these material risks to SLF.

88.     Uniti's purchase of Southern Light from SLF closed on July 3, 2017, and at that time, SLF received its Uniti stock equivalents.  SLF had substantially relied on, and had been given no reason to doubt the accuracy, or the fullness, of Uniti's public or private disclosures.

## IV.    The Fraud Is Revealed

### Litigation between Aurelius and Windstream

89.     Much to SLF's surprise (and later to its extreme detriment), mere weeks after closing on the 2017 Transaction, questions about the 2015 Uniti Spinoff started to circulate. For example in early August of 2017, Windstream became aware of market rumors that Aurelius was buying Notes to obtain a 25% position and also buying a significant position in credit default swaps (a short position, betting on Windstream to default).  The speculation was that Aurelius believed that Windstream had violated the Indenture by engaging in the spinoff and sale leaseback.  These

market rumors were reflected in a September 5, 2017 report issued by Covenant Review, which discussed the "recent market speculation that the separation of the Uniti business from Windstream's remaining businesses may have violated the Asset Sales covenant of the various Windstream bonds."

90.     As a result of these rumors, Uniti's stock started to slide.   On July 3, 2017, when SLF accepted the $65 million in Uniti's stock, the price was $25.26.  At the end of July, with a new management team in place and an increased revenue portfolio, it had inched up to $26.23. But after rumors and short positions came into play in early August, by August 31, 2017 the stock had dropped to $19.42.

91.     On September 21, 2017, Aurelius, a beneficial owner of more than 25% of the aggregate principal amount of the outstanding Notes, gave written notice to Windstream that the 2015 Uniti Spinoff and the associated sale-leaseback transaction constituted a prohibited "Sale and Leaseback Transaction" under the Indenture, and that Windstream was in violation of the Indenture's restrictive covenants.

92.     A few days later, Windstream acknowledged in a public filing that it received the Notice of Default, confirming to the market that the existence the previously-undisclosed risk that the spinoff and Master Lease amounted to a prohibited sale-leaseback transaction.   But Windstream denied that any default had actually occurred.  In a Form 8-K filed on September 25, 2017 at 4:09 PM ET, Windstream attempted to put its investors—and, by extension, Uniti's investors, like SLF—at ease, by stating:

> [o]n September 22, 2017, Windstream Services, LLC … received a purported notice of default dated September 21, 2017."  Windstream's public filing also stated that "[t]he Notice alleges that the transfer of certain assets and the subsequent lease of those assets in connection with the spinoff of Communications Sales & Leasing, Inc. (now known as Uniti Group, Inc.) in April 2015 constituted a Sale and Leaseback Transaction (as defined in the Indenture) which did not comply with the Sale and Leaseback covenant under the

Indenture. The transactions did not constitute a Sale and Leaseback Transaction, and the Company asserts no default occurred, and that no default is continuing, under the Sale and Leaseback covenant under the Indenture.

93.     But the market was unconvinced.  Windstream's public disclosure of its receipt of the Notice of Default had an unsurprising, immediate negative effect on both its own and *Uniti*'s stock price.  On September 26, 2017, the first full trading day after Windstream filed its Form 8-K, Uniti's stock price declined from $17.36 per share at the close of trading on September 25, 2019 to $15.66 per share at the close of trading on September 26, 2017, a decline of nearly 10%.  The entirety of the decline can be attributed to Windstream's disclosure of the Notice of Default, because no other material, company-specific information was disclosed that day.

94.     Uniti's stock price continued to decline on September 27, 2017, falling to $14.73, a decline of another 5.15%.  Over the two-day period from September 25, 2017 to September 27, 2017, Uniti's stock price declined 15.15%.  The entirety of this decline can also be attributed to Windstream's disclosure of the Notice of Default, because, again, no other material, company-specific information was disclosed on those days.  By the end of that month, Uniti's stock price dropped still further, to $14.60 on September 29, 2017.

95.     Aurelius, in its capacity as "Directing Holder" of the Notes, instructed U.S. Bank, as Trustee, to file the Indenture Litigation, alleging that the 2015 Uniti Spinoff and associated sale-leaseback transaction violated the Indenture.  The Trustee filed the action in the United States District Court for the Southern District of New York on October 12, 2017.  Windstream then brought Aurelius into the case by asserting various counterclaims against both Aurelius and the Trustee.  In part, Windstream sought injunctive relief to prevent the Trustee and Aurelius from declaring an Event of Default under the Indenture.

96.     Uniti was noticeably silent for nearly six weeks following Aurelius's notice of default.  But when Uniti finally spoke, rather than coming clean, it attempted to continue to mislead

investors.  Even though the risk of a Windstream default was now known by the market, Uniti downplayed the magnitude of that risk.  In its Form 10-Q for 3Q 2017, filed on November 2, 2017, Uniti spoke in relatively measured terms about the Notice of Default, but did not reveal that it had been aware of the risk of default from the beginning:

> On September 22, 2017, Windstream Services, LLC ("Windstream Services"), Windstream's primary operating subsidiary, received a purported notice of default dated September 21, 2017 from a large purported holder of Windstream Services' 6 3/8% Senior Notes due 2023 (the "Windstream Notes"). The notice alleged, among other things, that Windstream Services violated certain restrictive covenants of the indenture governing the Windstream Notes in connection with Windstream's Spin-Off of Uniti Group.  Windstream is challenging the alleged default in federal court and recently launched an exchange offer and consent solicitation to obtain a waiver of the alleged default from holders representing a majority of the aggregate principal amount of the Windstream Notes. If the alleged defaults claimed by the noteholder are not waived, the noteholder or the Windstream Notes' trustee may allege that an "event of default" has occurred under the Windstream Notes' indenture. An actual "event of default" would permit the Windstream Notes' trustee or holders of at least 25% in aggregate principal amount of outstanding of the Windstream Notes to declare the principal amount of all outstanding Windstream Notes to be immediately due and payable. Such an outcome would trigger cross-default provisions in Windstream's other debt instruments, including Windstream Services existing credit facility, which, in turn, would trigger a default under the Master Lease. In addition, Windstream Services' ability to pay dividends to Windstream Holdings under the terms of its indentures is subject to certain conditions, including the absence of a default or event of default, and any actual default or event of default could prevent Windstream Services from providing sufficient funding to Windstream Holdings to make payments on the Master Lease. Accordingly, we monitor the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments.

97.     Just a few days later, at the November 7, 2017 Wells Fargo Media & Telecom Conference, Kenny Gunderman was less measured, assuring the market that the risk of a Windstream default would never materialize: "We've looked very, very closely at the legal claim,

and we're very confident that the legal arguments are on Windstream's side.  So [we] think that that's going to resolve itself."

98.     To no one's surprise, Kenny Gunderman's public statements were consistent with the statements that Windstream's leadership were making about the Notice of Default and the Indenture Litigation, who denied that any violation of the restrictive covenants had occurred.  But Windstream's out-of-court conduct told a different story.  Windstream began executing a plan "to neutralize Aurelius" by "quietly exchang[ing] investors out of other bond tranches (with exit consents) into 6.375% notes due 2023 (with entry consents)."  Windstream's plan was to create a new majority of noteholders that could outvote Aurelius and waive any default that the 2015 Uniti Spinoff had triggered.  On October 5, 2017, Windstream's Board passed a formal resolution authorizing its management to execute this transaction "to address the allegations" in the Notice of Default.

99.     Buoyed by Kenny Gunderman's and Uniti's positive statements concerning the Indenture Litigation, Uniti's stock price reversed its decline.  From November 7, 2017 through February 15, 2019, the stock price increased by over 14%, from $16.53 to $19.98.

100.    But Windstream's plan to neutralize Aurelius failed, as did Windstream's legal defense.  On February 15, 2019, Judge Jesse Furman of the Southern District of New York determined that the spinoff and signing of the Master Lease breached the Indenture.  The court concluded that "[Windstream's] financial maneuvers – and many of its arguments [in the Court proceeding] – are too cute by half."  The court ruled, among other things, that the fact that the Windstream operating subsidiaries used and paid for all their former assets "walks like a lease and talks like a lease … because it is a lease."

101.    Remarkably, the court even went the additional step of holding that Windstream was "judicially estopped from denying that the [Windstream operating subsidiaries] 'lease' the [assets transferred to Uniti]."  The court explained, "having benefitted from repeated statements to state regulators that the [Windstream operating subsidiaries] would lease back the [assets transferred to Uniti], [Windstream] is estopped from now denying that the [Windstream operating subsidiaries] did in fact lease those assets—even if doing so would not serve its interests.

102.    With this strong rebuke, the court declared over $300 million of notes due and payable.  Looking back, if the "HoldCo" and "Captive" workaround appeared too good to be true, it is because it was.  The New York District Court's full opinion is attached as Exhibit A.

103.    The market's reaction to Judge Furman's order was swift and severe.  On the next trading day after the order, Uniti's stock price declined over 37%, from $19.98 on February 15, 2019 to $12.51 on February 19, 2019.  The entirety of the decline can be attributed to the Windstream default, as there was no other material, company-specific news disclosed to the market.

104.    Over the next three days, Uniti's stock price declined still further, to a closing value of $9.23 on February 22, 2019.  That amounted to a total decline from the February 15, 2019 closing price of over 53%, all of which can be attributed to the Windstream default.

105.    Although Uniti's stock price rebounded partially on February 25, 2019, that same day, Windstream Holdings (and all its subsidiaries) filed for Chapter 11 bankruptcy protection.  As a result of Windstream's bankruptcy, Uniti's stock price declined more than 9% over the next three trading days.

106.    As of the close of trading on the day prior to the filing of this Complaint, Uniti's stock price was trading at $9.29 per share, and SLF's $65 million in Uniti stock equivalents are

worth approximately $23.5 million.  But more deflation is anticipated, as Uniti faces extreme risks to its ability to operate as a going concern.  Uniti's bankruptcy risk arises because Windstream has the right, in its bankruptcy, to decide whether to terminate the Master Lease with Uniti.  While Uniti has continually tried to spin a Master Lease termination as unlikely to impossible, Windstream recently made it clear that termination is very much on the table.  Because Uniti currently derives the vast majority of its income from Windstream under the Master Lease, a termination of that lease would almost certainly force Uniti into bankruptcy, potentially wiping out all equity.

## V.      SLF's Attempts to Resolve the Dispute

107.    SLF's review of the Southern District of New York's decision raised serious concerns about Windstream's and Uniti's viability as ongoing businesses.  Those concerns were exacerbated by the fact that the same officers who led Windstream and Uniti in the court-maligned spinoff structure and entry into the Master Lease were still in top leadership roles at both companies—especially brothers Kenny Gunderman, CEO at Uniti, and Bob Gunderman, CFO at Windstream.  And both companies publicly downplayed or ignored the issues that Judge Furman identified.

108.    As a result, SLF wrote a letter to Uniti's independent directors in April 2019 requesting that they (i) identify and address management conflicts to ensure objective leadership handles all ongoing and future discussions about Uniti's future, (ii) appoint a special committee of independent directors with no prior relationships with Windstream to conduct a full, impartial investigation into the interactions (and inactions) of both Windstream and Uniti related to the spinoff of Uniti, and (iii) schedule an in-person meeting with SLF to further discuss the situation and SLF's specific requests.  Uniti declined all requests.

## Count I – Fraud in the Inducement (Suppression)
### (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)

109.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

110.    As detailed above, during SLF's negotiations with Uniti, Uniti Fiber and Kenny Gunderman represented to SLF that the 2015 Uniti Spinoff was a cutting-edge transaction that placed it at as an industry leader.  Uniti, Uniti Fiber, and Kenny Gunderman urged SLF to accept Uniti stock equivalents, rather than to proceed with SLF's preferred all-cash transaction because of Uniti's financial strength and the market statement a partial-stock transaction would make.

111.    At the same time, Uniti, Uniti Fiber, and Kenny Gunderman knew, should have known, or acted with reckless disregard for the facts that (1) the 2015 Uniti Spinoff and associated sale-leaseback transaction violated Windstream's indenture covenants; (2) the 2015 Uniti Spinoff and associated sale-leaseback transaction placed Windstream at risk of violating the Indenture's restrictive covenants; and (3) Windstream had told state regulators that the spinoff would result in a leaseback to the Windstream operating subsidiaries.

112.    Uniti, Uniti Fiber, and Kenny Gunderman elected to speak about the 2015 Uniti Spinoff and sale-leaseback transaction, and induced SLF to accept a partial-stock transaction that ultimately would include stock in Uniti.

113.    Once Uniti, Uniti Fiber, and Kenny Gunderman elected to speak about the 2015 Uniti Spinoff and sale-leaseback, and induced SLF to accept membership interests in Uniti Group LP exchangeable for common stock of Uniti Group, Inc., they assumed a duty to provide a full and accurate disclosure and not to suppress or conceal facts that materially qualified the representations that it made to SLF about those transactions.

114.    Uniti's public filings also gave rise to a duty to disclose its knowledge that—or its knowledge of the material risk that—the 2015 Uniti Spinoff violated the Indenture.  Uniti's, Uniti Fiber's and Kenny Gunderman's public statements characterized Windstream Holdings as the lessee under the Master Lease, touted Windstream and its financial condition, expressed a willingness to engage in additional sale-leaseback transactions with Windstream in the future, explained that Uniti was dependent on Windstream and that Uniti management was taking steps to monitor Windstream's viability, and described the company's outlook after the 2015 Uniti Spinoff.  These statements about Uniti's relationship with Windstream and Windstream's financial viability were materially misleading for failing to disclose that the Windstream operating entities were the *de facto* lessees of the copper and fiber network assets, and the risk that the 2015 Uniti Spinoff and sale-leaseback violated the Indenture's restrictive covenant, which would impair Windstream's ability to operate as a going concern.

115.    Uniti's, Uniti Fiber's, and Kenny Gunderman's knowledge of the material risk that the 2015 Uniti Spinoff placed Windstream in violation of the Indenture's restrictive covenants, that Windstream had engaged in prohibited sale-leaseback transactions, that violating the Indenture would financially cripple Windstream, and that Uniti's financial strength depended on Windstream's viability together materially qualified its earlier representations about the 2015 Uniti Spinoff and representations inducing SLF to accept partial-stock consideration.

116.    Uniti, Uniti Fiber, and Kenny Gunderman negligently or recklessly failed to disclose, or deliberately concealed, these material facts from SLF to induce it to consummate the 2017 Transaction and to accept partial-stock consideration.

117.    Had SLF known the true state of affairs about Uniti's financial position, its reliance on Windstream as a primary source of revenue, and the potential risks that Windstream faced as a

result of the 2015 Uniti Spinoff and associated sale-leaseback transaction, SLF would not have entered into the Purchase Agreement and would not have accepted Uniti stock equivalents.

118.    As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent suppression of material facts, SLF was induced to act to its detriment by entering into a contract for the sale of Southern Light and accepting Uniti stock equivalents.

119.    As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent suppression and concealment, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti stock equivalents and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, punitive damages, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count II – Conspiracy
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., Kenny Gunderman, and John P. Fletcher)**

120.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

121.    Uniti, Uniti Fiber, Kenny Gunderman, and Fletcher, along with Windstream, and Windstream's officers, directors, and employees, like and Thomas, engaged in concerted action to defraud potential investors like SLF. Windstream and Uniti combined to defraud SLF by misleading regulators and structuring the 2015 Uniti Spinoff in a way designed to avoid the Indenture's restrictive covenants, encouraging SLF to invest in Uniti, and failing to disclose material facts, including (1) Uniti's knowledge that the 2015 Uniti Spinoff and associated sale-leaseback transaction violated the Indenture's restrictive covenants; (2) Uniti's knowledge of the

risk that the 2015 Uniti Spinoff placed Windstream in violation of the Indenture's restrictive covenants; and (3) that violating the Indenture would financially cripple Windstream.

122.    The object and purpose of this scheme was to defraud and induce investors like SLF to purchase Uniti securities.

123.    As a direct and proximate result of this conduct, SLF suffered damages, including, but not limited to, the loss of the value of membership interests in Uniti Group LP exchangeable for common stock of Uniti Group, Inc. and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, Kenny Gunderman and John P. Fletcher for actual, consequential, compensatory damages, punitive damages, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count III – Violations of the Alabama Securities Act (Ala. Code § 8-6-17(a)(1)) (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)

124.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

125.    Uniti, Uniti Fiber, and Kenny Gunderman made an offer to sell derivative interests in Uniti in the State of Alabama, and SLF accepted Uniti's offer to buy derivative interests in Uniti in the State of Alabama.

126.    The derivative interests in Uniti are securities.

127.    SLF owns securities of Uniti.

128.    Uniti, Uniti Fiber, and Kenny Gunderman employed a device, scheme, or artifice to defraud investors, including SLF.

129.    As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent scheme, SLF was induced to purchase Uniti securities to its ultimate detriment.

130.    As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent scheme, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

131.    As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent omission, SLF was induced to purchase Uniti securities to its ultimate detriment.

132.    As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent omission, SLF suffered damages, including, but not limited to, the loss of the value its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

**Count IV – Violations of the Alabama Securities Act (Ala. Code § 8-6-17(a)(2))**
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)**

133.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

134.    Uniti, Uniti Fiber, and Kenny Gunderman made an offer to sell derivative interests in Uniti in the State of Alabama, and SLF accepted their offer to buy derivative interests in Uniti in the State of Alabama.

135.    The derivative interests in Uniti are securities.

136.    SLF owns securities of Uniti.

137.    Uniti, Uniti Fiber, and Kenny Gunderman made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

138.     SLF was induced to act based on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman.

139.     As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent omission, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count V – Violations of the Alabama Securities Act (Ala. Code § 8-6-17(a)(3)) (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)

140.     SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

141.     Uniti, Uniti Fiber, and Kenny Gunderman made an offer to sell derivative interests in Uniti in the State of Alabama, and SLF accepted Uniti's offer to buy derivative interests in Uniti in the State of Alabama.

142.     The derivative interests in Uniti are securities.

143.     SLF owns securities of Uniti.

144.     Uniti, Uniti Fiber, and Kenny Gunderman engaged in an act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

145.     SLF was induced to act based on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman.

146.     As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent omissions, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count VI – Violations of the Alabama Securities Act (Ala. Code § 8-6-19(c)) <br> (Against Kenny Gunderman and John P. Fletcher)

147.     SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

148.     As set forth above, Uniti and Uniti Fiber violated Section 8-6-19(a) of the Alabama Securities Act.

149.     Defendants Kenny Gunderman and John P. Fletcher are currently or were formerly officers and employees of Uniti and/r Uniti Fiber.

150.     While employed by Uniti and/or Uniti Fiber, Kenny Gunderman and Fletcher materially aided in the conduct giving rise to Uniti's and Uniti Fiber's liability under Alabama Code § 8-6-19(a).

WHEREFORE, SLF demands judgment in its favor and against Kenny Gunderman and Fletcher for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count VII – Violations of the Exchange Act (15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5(a)) <br> (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)

151.     SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

152.    SLF owns derivative interests in Uniti.  These derivative interests are securities.

153.    Uniti used a means or instrumentality of interstate commerce to effectuate the sale of securities to SLF.

154.    In connection with the sale of securities, Uniti, Uniti Fiber, and Kenny Gunderman, either directly or indirectly, employed a device, scheme, or artifice to defraud.

155.    As described above, Uniti, Uniti Fiber, and Kenny Gunderman knew that the structure of the 2015 Uniti Spinoff and Uniti's execution of the Master Lease with Windstream violated or risked violating the restrictive covenants in the Indenture.

156.    Uniti, Uniti Fiber, and Kenny Gunderman had a motive to hide the risks associated with the 2015 Uniti Spinoff and sale-leaseback transactions from investors like SLF. Windstream's financial viability depended on not defaulting on its Notes.  And Uniti's financial viability—as well as the employment and lucrative compensation package of Kenny Gunderman at Uniti and Bob Gunderman, his brother, at Windstream—in turn, depended on Windstream's continued success.  If it were publicly disclosed that Windstream violated—or had engaged in a transaction that risked violating—the Indenture and causing a default, the value of Uniti and its stock and stock equivalents would crater.

157.    Uniti's internal discussions show that this motive to attract investment while hiding the risks of the 2015 Uniti Spinoff from potential investors drove their misleading public disclosures.  Before the spinoff, Windstream's Vice President of Capital Markets and Investor Relations instructed executives that were intimately involved with the 2015 Uniti Spinoff "not [to] go into detail" unless "pressed" on why the lease would be implemented with Windstream Holdings.  And at Uniti, Kenny Gunderman's role was to "reinforce the message" about the

viability of the 2015 Uniti Spinoff.  Even then, the "talking points" avoided any discussion of the existential risks to Windstream and Uniti that the spinoff and Master Lease posed.

158.    The facts stated above give rise to a strong inference that Uniti, Uniti Fiber, and Kenny Gunderman acted with scienter.

159.    SLF relied on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman in purchasing securities.

160.    As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's omission of material facts, SLF was induced to purchase Uniti securities to its ultimate detriment.

161.    As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's omission of material facts, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

**Count VIII – Violations of the Exchange Act (15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5(b))**
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)**

162.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

163.    SLF owns derivative interests in Uniti.  These derivative interests are securities.

164.    Uniti used a means or instrumentality of interstate commerce to effectuate the sale of securities to SLF.

165.    In connection with the sale of securities, Uniti, Uniti Fiber, and Kenny Gunderman, either directly or indirectly, made one or more untrue statements of a material fact or omitted to

state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

166.   The facts stated above give rise to a strong inference that Uniti, Uniti Fiber, and Kenny Gunderman acted with scienter.

167.   SLF relied on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman in purchasing securities.

168.   As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's omission of material facts, SLF was induced to purchase Uniti securities to its ultimate detriment.

169.   As a direct and proximate result of Uniti's, Uniti Fiber's, and Kenny Gunderman's omission of material facts, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count IX – Violations of the Exchange Act (15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5(c))
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)**

170.   SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

171.   SLF owns derivative interests in Uniti.  These derivative interests are securities.

172.   Uniti used a means or instrumentality of interstate commerce to effectuate the sale of securities to SLF.

173.   Uniti, Uniti Fiber, and Kenny Gunderman, either directly or indirectly, engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon a person, in connection with the purchase or sale of any security.

174.    The facts stated above give rise to a strong inference that Uniti, Uniti Fiber, and Kenny Gunderman acted with scienter.

175.    SLF relied on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman in purchasing securities.

176.    As a proximate result of Uniti's, Uniti Fiber's, and Kenny Gunderman's omission of material facts, SLF was induced to purchase Uniti securities to its ultimate detriment.

177.    As a direct and proximate result of Uniti's, Uniti Fiber's, and Kenny Gunderman's omission of material facts, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count X – Violations of the Exchange Act (15 U.S.C. § 78t)
### (Against Kenny Gunderman)

178.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

179.    As described above, Uniti and Uniti Fiber committed violations of federal securities laws.  Kenny Gunderman violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.   Kenny Gunderman also knowingly or recklessly provided substantial assistance to Uniti's and Uniti Fiber's violations of Section 10(b) and Rule 10b-5 and knowingly or recklessly provided substantial assistance to violations of Section 10(b) and Rule 10b-5 by directing the fraudulent scheme identified in this Complaint.

180.    Kenny Gunderman, as President and CEO of Uniti and Uniti Fiber, and with knowledge of the details of Windstream's maneuvers in an attempt to give the appearance of not

violating the Indenture's restrictive covenants, is a control person with the power to control Uniti's statements and omissions of material facts.  Kenny Gunderman actually did control Uniti's and Uniti Fiber's statements and omissions of material facts.

181.    By reason of the foregoing, Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), deems Kenny Gunderman to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Uniti and Uniti Fiber to whom such assistance was provided.

WHEREFORE, SLF demands judgment in its favor and against Kenny Gunderman, for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Prayer for Relief

WHEREFORE, SLF demands judgment in its favor and against Defendants for the following:

182.    Actual, compensatory, and consequential damages including, but not limited to, the damages proximately caused as a result of the fraud by Uniti, Uniti Fiber, Kenny Gunderman, and Fletcher; attorneys' fees and costs; and other legally recoverable damages under the Purchase Agreement;

183.    Reformation of the Purchase Agreement to an all-cash deal for $700 million;

184.    Punitive damages as a result of the fraudulent, intentional, willful, and wanton conduct by Uniti, Uniti Fiber, Kenny Gunderman, and Fletcher;

185.    All such other, further and different relief in law and equity as this Court may deem just and appropriate.

July 3, 2019

Respectfully submitted,

Edward S. Sledge IV
Dylan C. Black
Zachary A. Madonia
Emily M. Ruzic
Stanley E. Blackmon
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Phone: (205) 521-8000
Fax: (205) 521-8800
esledge@bradley.com
dblack@bradley.com
zmadonia@bradley.com
eruzic@bradley.com
sblackmon@bradley.com

*Attorneys for Plaintiff SLF Holdings, LLC*