# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SLF HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 1:19-cv-01813-LPS |
| UNITI FIBER HOLDINGS, INC.; UNITI | ) | |
| GROUP INC.; | ) | |
| KENNETH GUNDERMAN; JOHN P. | ) | |
| FLETCHER, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED COMPLAINT

Plaintiff SLF Holdings, LLC ("SLF") states as follows for its amended complaint against Uniti Fiber Holdings, Inc., Uniti Group, Inc., Kenneth Gunderman, and John P. Fletcher (collectively, the "Defendants").

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff SLF is a privately held limited liability company organized under the laws of the State of Alabama.  No member of SLF is a resident or citizen of Arkansas, Maryland, or Delaware.

2.      Defendant Uniti Group, Inc. ("Uniti") is a publicly-traded Maryland corporation with its principal place of business in Little Rock, Arkansas (Ticker symbol UNIT).  Uniti was formerly known as Communications Sales & Leasing Inc., or CS&L, until its name was changed in 2017.  References herein to Uniti refer to the entity formerly known as CS&L before and after the name change.

3.      Defendant Uniti Fiber Holdings, Inc. ("Uniti Fiber"), a wholly-owned subsidiary of Uniti, is a Delaware corporation with its principal place of business in Little Rock, Arkansas.

4.     Defendant Kenneth ("Kenny") Gunderman is a natural person who on information and belief is a citizen of Arkansas.

5.     Defendant John P. Fletcher is a natural person who on information and belief is a citizen of Arkansas.

6.     This Court has original jurisdiction over Counts I, II, III, IV, V, VI, and XI pursuant to 28 U.S.C. § 1332, 28 U.S.C. § 1367, and 28 U.S.C. § 2201.

7.     This Court has original jurisdiction over Counts VII, VIII, IX, and X pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

8.     Venue is proper under 28 U.S.C. § 1391.

## INTRODUCTION

9.     This case involves complex and multifaceted financial fraud originally perpetrated by two telecommunications companies, Uniti and Uniti's former parent, and largest current customer, Windstream.[1]  Uniti (when it was known as CS&L) was a wholly-owned subsidiary of Windstream Holdings.  In 2015, ostensibly as part of a pioneering endeavor to create the first telecommunications real estate investment trust, Uniti was spun off from Windstream (the "2015 Uniti Spinoff").  Immediately following the spinoff, certain former Windstream directors and advisors who worked on the spinoff—including Kenny Gunderman, a CPA, former investment banker for Windstream, and brother to Robert ("Bob") Gunderman, Windstream's then-Treasurer

---

[1]  "Windstream" generally and collectively refers to a publicly-traded holding company, Windstream Holdings, Inc. ("Windstream Holdings") and its subsidiaries.  Specific Windstream-entity names will be used when distinction is important or necessary.  Windstream Holdings was created in 2013 to serve as the publicly-traded holding company for all of the Windstream entities.  Before that, the publicly-traded parent entity was Windstream Corporation.  Windstream Corporation is now known as Windstream Services, LLC ("Windstream Services") and is a wholly-owned subsidiary of Windstream Holdings.  Windstream Services is itself a holding company, and its subsidiaries are the operating entities of Windstream (the "Windstream operating subsidiaries").

(and now CFO)—became Uniti's officers and directors.  Kenny Gunderman also became CEO of Uniti Fiber.

10.     According to Windstream and Uniti as of 2015, in connection with the spinoff, the Windstream operating subsidiaries sold a majority of their fiber and copper network assets to Uniti, and then Uniti leased those assets back to Windstream via a "Master Lease" agreement.  Now Windstream seeks to recharacterize the whole transaction as a "financing arrangement" whereby Uniti gave Windstream an unsecured loan and never actually took title to the fiber and copper network assets.  Either way, Windstream is Uniti's largest customer, accounting for more than two-thirds of Uniti's annual revenues every year since the spinoff.  Ostensibly, the Master Lease was between Uniti and Windstream Holdings; but, in effect, the Windstream operating subsidiaries became the *de facto* lessees (or, depending on which of Windstream's characterizations of the transaction is correct, remained the owners) of the fiber and copper network assets, with exclusive control over the use of those assets.

11.     Following the 2015 Uniti Spinoff, Windstream and Uniti executives continued to tout the pioneering nature of the transactions, seeking professional prestige and financial gain from unwitting and unknowing investors.  One of those unsuspecting investors was Plaintiff SLF.  Before 2017, SLF owned Mobile, Alabama-based Southern Light, LLC ("Southern Light"), a fiber optic network provider.  In late 2016 and early 2017, SLF and Uniti engaged in negotiations for Uniti and/or Uniti Fiber to acquire SLF's membership interests in Southern Light.  In connection with those negotiations, Uniti and Kenny Gunderman initially offered an all-cash transaction, which was consistent with SLF's expressed preference, but later insisted that SLF accept a partial cash/partial stock transaction involving $65 million worth of the equivalent of shares of Uniti stock.  For tax reasons, Uniti offered membership interests in Uniti Group, LP, a limited

partnership for which Uniti is the general partner.  These interests are exchangeable into equal shares of Uniti stock (or their cash equivalent value, at Uniti's election).

12.     To induce SLF into accepting the exchangeable membership interests, rather than cash, Uniti and Kenny Gunderman touted, among other things, the 2015 Uniti Spinoff and sale leaseback transactions, and spoke in glowing terms about their own business, the Master Lease, and Windstream's business.  They also touted the fact that Uniti was organized as a publicly-traded real estate investment trust ("REIT") and the brilliance and uniqueness of the REIT structure.  But Uniti and Kenny Gunderman hid from SLF, just as they had hid from investors in their public filings and disclosures, (i) the material risk that the 2015 Uniti Spinoff was a prohibited sale-leaseback transaction pursuant to the financial instrument governing certain of Windstream's notes (the "Indenture"), and (ii) the true extent of the risk that the Master Lease was not a true lease, but rather a carefully disguised financing arrangement that could (a) violate various provisions of the Indenture (including debt and asset sale restrictions), (b) jeopardize Uniti's existence as a REIT; and (c) put Uniti and its investors at materially greater financial risk in the event Windstream filed for bankruptcy.

13.     The reality was that the "pioneering" 2015 Uniti Spinoff and REIT structure contained two major risks known to both Uniti and Windstream at the 2015 closing – the risk that the transaction was a sale-leaseback transaction in violation of the Indenture and the risk that the Master Lease might be recharacterized as a financing arrangement.  Both undisclosed risks materially endangered the investments of Uniti shareholders, like SLF.

14.     Windstream and Uniti had attempted to avoid the Indenture's sale-leaseback restrictions by having Windstream Holdings, rather than the Windstream operating subsidiaries, act as the ostensible lessee.  But Windstream and Uniti executives, including Kenny Gunderman,

4

who helped orchestrate the spinoff and then became Uniti's first post-spinoff President and CEO, knew that the Windstream operating subsidiaries had represented to multiple state regulators pre-spinoff that they would be the lessees of the assets and exercised *de facto* control over the network assets post-spinoff, just as they had disclosed to the state regulators.

15.     All of this exposed Windstream to material risks that the spinoff transaction could be challenged in court—as has already been done by Windstream noteholders, who successfully argued the spinoff violated the Indenture's covenant prohibiting sale-leaseback transactions, and is currently being done *by Windstream itself*, which now alleges in its bankruptcy that the Master Lease is not a true lease, but rather constitutes an unsecured financing arrangement.  Yet, neither Uniti nor Kenny Gunderman disclosed to SLF, or any other Uniti investor, that there was even a risk that the spinoff could have violated the Indenture's sale-leaseback covenant, or the true extent of the risk that the Master Lease is not a true lease at all.

16.     This information was critical.  If Windstream violated the restrictive covenants governing its notes (and a federal court in New York has found that it did), the noteholders could accelerate the notes, obligating Windstream immediately to repay hundreds of millions of dollars.  Such an acceleration would bankrupt (and has bankrupted) Windstream.  Additionally, a Windstream bankruptcy, and a possible rejection of the Master Lease, would have severe negative financial consequences for Uniti, including on Uniti's operating results and its ability to access credit, satisfy its existing debt obligations, and decrease its reliance on Windstream's revenue.

17.     Furthermore, having the Master Lease recharacterized as a financing arrangement would materially increase Uniti's risks in a Windstream bankruptcy, as it could allow Windstream to stop making monthly rent payments to Uniti and leave Uniti with an unsecured claim, which would then place Uniti's own solvency in question.  Even apart from Windstream-bankruptcy-

specific risks, recharacterizing the Master Lease as a financing arrangement would also potentially threaten Uniti's very existence as a REIT.

18.     The risks that these things could happen were well known to Uniti and Kenny Gunderman, but they never mentioned them, despite having a legal duty to disclose all material facts to investors, like SLF.

19.     Uniti's acquisition of Southern Light closed on July 3, 2017.  That day, Uniti Fiber acquired all of SLF's membership interests in Southern Light.  Less than three months later, Uniti's fraud began to come to light.  On September 21, 2017, the hedge fund Aurelius Capital Master, Ltd. ("Aurelius"), which had been buying the Windstream notes governed by the Indenture (the "Notes"), served a written notice upon Windstream that Windstream was in violation of the Indenture's restrictive covenants as a result of the 2015 Uniti Spinoff and sale-leaseback transactions.  Shortly thereafter, Aurelius caused the trustee of the Notes, U.S. Bank National Association ("U.S. Bank"), to initiate breach of contract litigation against Windstream in the Southern District of New York, a case styled *U.S. Bank Nat'l Ass'n, as indenture trustee for Windstream Services, LLC's 6 3/8% Notes due 2023 v. Windstream Services, LLC v. Aurelius Capital Master, Ltd.*, Case 1:17-cv-07857-JMF-GWG (the "Indenture Litigation").

20.     The market reacted severely and negatively to Aurelius's notice of default (along with short positions Aurelius had been taking in Windstream in the weeks before serving the notice).  Windstream's stock price understandably dropped dramatically.  But so too did Uniti's, falling from $25.26 on July 3, 2017 to $14.60 by September 29, 2017, a decline of over 42%.

21.     Uniti was noticeably silent for nearly six weeks following the notice of default.  But when Uniti finally spoke, rather than coming clean, it continued to perpetuate the fraud by downplaying the magnitude of the risk of a Windstream default.  At a November 7, 2017 investor

conference, Kenny Gunderman assured the market that the risk of a Windstream default would never materialize: "We've looked very, very closely at the legal claim, and we're very confident that the legal arguments are on Windstream's side.  So [we] think that that's going to resolve itself."

22.     The situation, however, did not "resolve itself" favorably for Windstream and Uniti. On February 15, 2019, United States District Court Judge Jesse Furman entered Findings of Fact and Conclusions of Law in the Indenture Litigation.  Judge Furman's Findings of Fact and Conclusions of Law are attached as Exhibit A.  He ruled that the Windstream operating subsidiaries were the *de facto* lessees under the Master Lease agreement, and that, as a result, the 2015 Uniti Spinoff and the associated sale-leaseback transaction violated the Indenture governing the Notes.

23.     As a result of this "Event of Default," more than $300 million of Notes were accelerated and deemed immediately due and payable.  Ten days later, Windstream Holdings, Uniti's largest customer, filed a bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York.  The ongoing effect and aftershocks of Windstream's bankruptcy have also caused Uniti's stock to plummet—to the point that Uniti itself is currently at risk of bankruptcy, potentially wiping out all of SLF's $65 million investment.  Uniti's stock traded at $9.29 as of market closing on July 2, 2019, the day before SLF filed its initial complaint.  As of market close on November 15, 2019, Uniti's stock price traded at $7.20.

24.     While Windstream has continued to make payments under the Master Lease during its bankruptcy case, it has also taken steps to attempt to re-characterize the Master Lease as a financing, an effort that is the subject of ongoing litigation in an Adversary Proceeding in the Bankruptcy Court.  Windstream's complaint in the Adversary Proceeding is attached as Exhibit B.

25.     Windstream's filings in that Adversary Proceeding have brought to light even more egregious behavior by both Windstream and Uniti and their key executives during the lead-up to the 2015 Uniti Spinoff and demonstrate that the entire transaction was predicated upon false information regarding the assets involved:  inflated projections of the useful life of the copper wire assets that formed almost 80% of the to-be-spun-off networks.

26.     The spinoff of Uniti as a separate, publicly-traded entity would be attractive only if Uniti could qualify as a REIT for tax purposes, and the Master Lease could be treated as a "true lease."  These treatments were achieved only with the aid of false and inflated information about the useful life of copper wire.  The IRS blessed the treatment of Uniti as a REIT in a unique private letter ruling in part because Windstream told the IRS the estimated useful life of copper wire in the to-be-spun-off networks was 30 to 40 years, information it knew to be at odds with prior valuations in Windstream's possession at the time, and with (what Windstream now alleges in its bankruptcy to be) its own accounting for copper wire at the time (depreciating such assets over 20 years).  Similarly inflated useful life of copper wire was the underpinning of an analysis by Windstream's advisor Ernst & Young ("E&Y"), and a "true lease" opinion delivered by Skadden Arps Slate Meagher & Flom ("Skadden") to Uniti's management.  Only by assuming that copper wire had a useful life of more than double its true useful life did the Master Lease perform as a lease: otherwise, the assets being leased would be used up during the term of the lease.  Without the Master Lease being a lease, Uniti's ability to continue as a REIT would be thrown into question, as Uniti itself recognized.

27.     The same Windstream and Uniti executives who provided this inflated information also knew that the useful life information upon which their outside experts relied was far out of step with other valuations Windstream and Uniti possessed and/or were aware of at the time of the

spinoff.  The inflated useful life of copper wire used by Windstream and Uniti was inconsistent with Windstream's own financial decline and oblivious to the reality of copper wire's inevitable and hastening obsolescence.  A true useful life treatment would have shown that the useful life of the copper assets was exhausted within the initial term of the Master Lease, or at the outside, during the initial five-year add-on term.

28.     The Indenture Litigation pushed Windstream into bankruptcy by highlighting the fraudulent nature of the spinoff as a prohibited sale-leaseback transaction, and Windstream's bankruptcy has further highlighted Windstream's and Uniti's fraud related to the economic viability of the assets originally transferred from Windstream to Uniti, opening the companies up to the claim that the Master Lease was a prohibited financing and not a "true lease."  Ultimately, these risks were apparent from the beginning to those who concocted the scheme, but neither risk was disclosed to SLF.

29.     Adding to the deceit, in 2017, when Uniti closed a deal with SLF and SLF agreed to take Uniti stock equivalents as partial consideration, Uniti made several misrepresentations in its representations and warranties to induce SLF to enter into the operative agreement and close the transaction.  These misrepresentations included that Uniti had all the necessary consents to enter into the transaction (it apparently did not), and that Uniti's closing of the transaction would not violate any material agreements to which Uniti was a party (it apparently did), and that Uniti would file a post-closing Prospectus supplement that was free from material misstatement or omission (it incorporated by reference multiple false and misleading statements).

## FACTUAL ALLEGATIONS

### I.    Spinoff and Sale-Leaseback Transaction

### Uniti Spinoff Origins and Key Players

30.    The roots of the 2015 Uniti Spinoff date back to 2012.  At that time, Windstream was a telecommunications company headquartered in Little Rock, Arkansas.  As context, it is important to note that, as of November 30, 2012, Windstream's stock was trading at $8.28 per share, a 38% fall from its December 1, 2010 value of $13.31.  Whereas Windstream's stock was near all-time highs as of late 2010, it had taken a sharp decline over the next two years due, in large part, to its aging telecommunications infrastructure.  It needed to make substantial upgrades and improvements to its network, especially to its copper infrastructure, or it risked continued financial decline and/or ruin.

31.    However, infrastructure investments are expensive, and Windstream was in a poor cash position.  Also, Windstream was a yield stock, much like a utility, and not a growth stock.  Therefore, its investors expected to receive a healthy dividend.  And, as a utility-type stock, banks were unwilling to lend at multiples normally reserved for growth businesses.  During this period of decline, Windstream considered many options, including a sale.  None of the options were palatable.

32.    For many years before 2012, including the two years of steep stock declines, Windstream worked regularly with Stephens Inc. ("Stephens"), a privately held investment banking/financial services firm also headquartered in Little Rock.  Defendant Kenny Gunderman was then working at Stephens, having left Lehman Brothers' New York office a few years earlier.  Before 2012, Kenny Gunderman, through his various roles as senior telecom investment banker,

executive vice president, and co-head of investment banking for Stephens, came to know Windstream well.

33.     In fact, for years before 2012, Kenny Gunderman and Windstream had discussed the concept of spinning Windstream's fiber and copper network into a REIT.  As they conceived it, the REIT structure would increase Windstream's financial flexibility, improve its tax flow and cash flow efficiency, and, notably, attract outside investment.

34.     But a lightbulb moment came in late 2012 when a casino/gaming facility announced its intentions to separate its gaming operating assets and real property assets into two tax-free, publicly-traded REITs.  Kenny Gunderman and Windstream were excited about the prospect of pioneering the first REIT created from a fiber and copper network.  This had never been done before; fiber and copper network assets had previously been thought to be un-REIT-able since they are not strictly "real estate" in a traditional sense, but a favorable ruling from the IRS was seen as opening the door for REIT status to be applied to non-traditional assets.

35.     Then, at a February 1, 2013 Windstream board meeting, a REIT was formally suggested, which would (a) get a larger lending multiple from banks, (b) allow Windstream to deleverage and free up cash for investment into its infrastructure, (c) result in two companies, one attractive to growth investors and one attractive to yield investors, and (d) carry substantial tax benefits.  The board liked the idea and wanted to investigate further.  But there were regulatory issues to overcome.

36.     To qualify as a REIT, a company must meet several requirements.  For example, a REIT must, first, invest at least 75% of its assets in real estate, and derive at least 75% of its gross income from rents from real property, interest on mortgages financing real property, or sales of real estate.  Second, a REIT must pay at least 90% of its taxable income in the form of shareholder

dividends each year.  As a result, a properly-formed REIT is often considered a safe investment because 75% of its income must come from real estate, and because a high percentage of taxable income must be paid as a dividend each year.  Windstream, Kenny Gunderman and others moved forward with implementing the non-traditional REIT concept.

37.     Uniti, then known as Communications Sales & Leasing, Inc., was incorporated as a wholly-owned subsidiary of Windstream in the state of Delaware in February 2014 and reorganized in the state of Maryland in September 2014.  From the date of its incorporation until after the spinoff, Uniti management was dominated by Windstream executives and former Windstream advisors.

38.     Having initiated the non-traditional REIT concept, Kenny Gunderman started serving as "lead adviser relationship person" at Stephens with respect to Windstream's proposed spinoff transaction.  Stephens and Kenny Gunderman were handsomely paid for this work, with Windstream paying Stephens over a million dollars in fees.  Kenny Gunderman eventually left Stephens right before the spinoff to become Uniti's first post-spinoff President and CEO.  He still serves in both positions today, and he is well compensated for his work: according to Uniti's annual proxy filings, Gunderman has received over $5 million in compensation every year since the spinoff.

39.     Windstream tapped its General Counsel, Defendant John Fletcher, to direct and implement Windstream's legal and regulatory strategy for the proposed REIT spinoff transaction.  At all relevant times leading up to the spinoff, which eventually resulted in Uniti holding assets formerly owned by Windstream, Fletcher served as General Counsel of both Windstream and Uniti.  With a client on either side of the upcoming transaction, Fletcher could not effectively represent both in "negotiating" the terms of the 2015 Uniti Spinoff and the Master Lease. He ended

up leading the "Windstream Group," along with Dan King and Willis Kemp, with representation from Skadden.

40.     Windstream's then-CFO, Tony Thomas, was intimately involved in all parts of planning, preparation, and implementation of the spinoff.  Until a few months before the spinoff, while simultaneously serving as CFO of Windstream, Thomas also served as Uniti's President and CEO.  Although he was both a Windstream and a Uniti executive at the time, Thomas led the "Uniti Group" that negotiated against Fletcher's "Windstream Group" over the terms of the 2015 Uniti Spinoff, including the terms of the Master Lease.  Jeff Small and the law firm Bryan Cave LLP also served on the Uniti Group.

41.     In the fall of 2014, Master Lease negotiations ended.[2]  Then, on December 11, 2014, Thomas was named CEO of Windstream, a position he still holds today.

## Structural Spinoff Issues

42.     As a telecommunications company, Windstream is regulated by both state and federal authorities.  Those regulators posed a potential hurdle to the 2015 Uniti Spinoff because Windstream was selling off the very telecommunications infrastructure it used to serve its customers.  Several fundamental problems had to be addressed from the outset:

    (a)     First, Windstream had over $8 billion of long-term debt, including at least $700 million in outstanding Notes, and the agreements governing the debt, including the Indenture governing the Notes, restricted what sort of transactions Windstream could undertake.  Such restrictive covenants are customary; they provide lenders/noteholders with assurance that a company will not undertake fundamental changes to its core business,

---

[2] Not surprisingly, with Windstream and Uniti executives on both sides of the "negotiating" table, the Master Lease was not the result of an arm's length negotiation.  Judge Furman found in the Indenture Litigation that the Master Lease "was designed and drafted within and by Windstream."

13

or sell off material assets outside of the ordinary course of business, or take other actions that might put repayment at greater risk than bargained for by the lenders/noteholders.

(b)     Second, Windstream had to obtain state regulatory approvals.  Many states, including Alabama, regulate telecommunications companies like Windstream as a utility. State public service commissions, charged with protecting their citizens, regulate certain telecom infrastructure transfers because states want to verify that their most vulnerable, at-risk citizens have reliable, uninterrupted access to telephone services.

(c)     Third, Windstream would need, post-spinoff, the ability to access, control, and use the assets.  Otherwise, it could not operate its core business or meet its regulatory obligations.   Windstream was <u>not</u> considering a change to its core business; it was considering moving its assets into a new entity and then using those assets.  It was always an understood and stated requirement that Windstream would not and could not lose the right to use and operate the assets transferred to the REIT.

(d)     Fourth, Uniti had to qualify as a REIT and be taxed as such.  This required the IRS to approve Uniti as a REIT.  If the IRS, for example, rejected the proposed REIT treatment of non-traditional "real estate" assets like copper wire and fiber optic cables, the structure would crumble.  Heightening the challenge of securing REIT tax treatment, copper wire and fiber optic cables are rapidly depreciating assets, unlike traditional real estate.

(e)     Finally, it was vitally important to Windstream and Uniti that the Master Lease be deemed a "true lease" and not be subject to recharacterization as a financing.  If the Master Lease did not meet the legal standards of a true lease, it would put Uniti and its shareholders at greater risk in a Windstream bankruptcy.

Each of these issues had to be successfully addressed before the spinoff could happen.

## Note Restrictions

43.     One possible way to effectuate an asset spinoff that would still give Windstream legal access to the assets would be to have Windstream sell its assets to the REIT and simultaneously enter into a long-term leaseback agreement providing Windstream access to the assets.   While this solution would satisfy regulatory concerns, the Indenture governing Windstream's Notes would not allow it.

44.     Specifically, the Indenture prohibited Windstream Corporation (which was the Windstream parent at the time the Indenture was executed) from entering, or permitting certain of its subsidiaries (including the Windstream operating subsidiaries) to enter, into a "Sale and Leaseback Transaction," absent certain inapplicable exceptions.  In particular, Section 4.19 of the Indenture provides:

> Sale and Leaseback Transactions.
>
> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction.

The "Company" was defined in the Indenture as "Windstream Corporation."  And Windstream conceded in the Indenture Litigation that "Restricted Subsidiaries" was defined to include the Windstream operating subsidiaries.

45.     The Indenture then defines a "**Sale and Leaseback Transaction**" as:

> any transaction involving any of the assets or properties of such Person whether now owned or hereafter acquired, whereby such Person sells or otherwise transfers such assets or properties and then or thereafter leases such assets or properties or any part thereof or any other assets or properties which such Person intends to use for substantially the same purpose or purposes as the assets or properties sold or transferred. [3]

---

[3] "Person" was defined broadly to include "any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity."

A sale of the telecom infrastructure assets to Uniti, followed by a leaseback of those same assets, would be a clear violation of this provision in the Indenture.

46.     Alternatively, the assets could be used to support additional loans to Windstream with rental payments flowing to Uniti each month just like installment payments on a debt.  But such a structure also risked running afoul of the Indenture:  it prohibited Windstream Corporation and its Restricted Subsidiaries from incurring additional debt unless, after giving effect to the additional debt, Windstream kept its Consolidated Leverage Ratio below a certain ratio.  Section 4.09 of the Indenture states:

> The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness; provided however, that the Company or any of its Restricted Subsidiaries that are Guarantors may Incur Indebtedness, if the Company's Consolidated Leverage Ratio at the time of the Incurrence of such additional Indebtedness, and after giving effect thereto, is less than 4.5 to 1."

47.     These hurdles were identified early on by Windstream's then-CFO, Tony Thomas. In an April 15, 2013 email to Bob Gunderman, Thomas wrote:

> Here are some questions I have related to the Captive…  We need a capital structure that works with the Indenture; we may be able to use the HoldCo strategy here.  Create HoldCo and put Windstream Financial underneath HoldCo…  Remember, the sales – leaseback provision in the indenture can be a limited factor here.

48.     Thomas' idea "to use the HoldCo strategy here" was his attempt to get around the Indenture's prohibition against the Windstream operating subsidiaries selling their assets to Uniti and leasing them back so that they could keep using them.  Instead, Windstream would (i) create a new holding company (Windstream Holdings) that would own Windstream Corporation and all other Windstream entities as subsidiaries; (ii) cause the Windstream operating subsidiaries to sell

their fiber and copper network assets to a REIT entity ("the Captive" in Thomas' email; in other words, Uniti), and then (iii) have Windstream Holdings, which is not a party to the Indenture and was not covered by the restrictive covenants, lease the assets back from Uniti.  As lead of the "Uniti Group," Thomas later engaged in "negotiations" with his counterparts on the "Windstream Group" – the very company that employed him – to effectuate this very structure.  But then there had to be one more step, because the holding company did not have any operations, and the Windstream operating subsidiaries that needed access to the assets were all prohibited by the Indenture from leasing back the assets.

49.     The effort to get the use of the assets back to the operating subsidiaries led Windstream, Thomas, Fletcher, Bob Gunderman, and Kenny Gunderman to extend two incompatible narratives for two different groups.  One story would be told for the financial markets and a different one for the state regulatory agencies.

50.     Windstream's Board ultimately approved the "HoldCo" structure alluded to in Thomas's April 15, 2013, email, and through the planning, preparation, actions, directions, and decisions of its agents, consultants, and executives, including but not limited to Bob Gunderman, Kenny Gunderman, Fletcher, and Thomas, in August 2013, Windstream Holdings was created to serve as the HoldCo, while Windstream Corporation, the previous publicly-traded company, became its wholly-owned subsidiary.  Windstream Holdings ultimately leased the assets back from Uniti post-spinoff.

## State Regulatory Approvals

51.     Between July and December of 2014, Windstream worked on the second hurdle: convincing state regulators that the proposed transaction would not put Windstream's customers' service at risk.

52.     John Fletcher, the point man on the regulatory approval process, understood the purpose of these approvals.  For example, when asked at trial in the Indenture Litigation about Uniti's application to the Alabama Public Service Commission ("PSC"), Fletcher testified:

Q.     Now, at the time of [the Alabama PSC] application, you understood that the regulators were focused on whether [Windstream's operating subsidiaries] would be able to continue to operate and discharge their regulatory obligations after they transferred their assets, correct?

A.     Correct.

….

Q.     And you understood that one of the reasons for that concern was that [Uniti], which was becoming the owner of the assets, was not a regulated entity, is that correct?

A.     Which entity?

Q.     CSL [Uniti].

A.     That was one of the questions of these proceedings, as to whether it should become a regulated entity.

Q.     Am I correct that at the time of these proceedings, CSL [Uniti] was not a regulated entity?

A.     Correct.

…

Q.     And when you told the regulatory authorities in Alabama that [Windstream's operating subsidiaries] would be leasing back the transferred assets, you were directly addressing what the regulators were focused on, is that correct?

A.     I'm not sure I can answer. I don't know exactly what they were focused on in each jurisdiction.

Q.     Would you agree that, in general, the regulators were focused on whether the transferor subsidiaries would be able to continue to operate and discharge their regulatory requirements?

A.     Yes.

Q.     And am I correct that by telling the regulatory authorities in Alabama that the [Windstream operating subsidiaries] would be leasing back the transferred

assets, you were providing the assurance that they would be able to continue to operate and discharge their regulatory requirements, correct?

A.      I wouldn't use the word "assurance," but it was relevant to that concern.

53.      In short, Windstream, Fletcher, and Thomas, along with Bob Gunderman, Kenny's brother and Windstream's Treasurer, told regulators, including the Alabama PSC, that the Windstream operating subsidiaries would have uninterrupted access to the critical assets through a simple sale-leaseback transaction.  John Fletcher, who simultaneously was assuring potential investors that Windstream Holdings would be the lessee of the critical assets, while studiously omitting any disclosure to investors that the Windstream operating subsidiaries were acting as the *de facto* lessees, took the lead.

54.      Throughout 2014, Fletcher, acting as General Counsel for both Windstream and Uniti, and with the knowledge, support, and approval of Windstream officers and directors, drafted, reviewed, and signed various applications, affidavits, and other regulatory documents designed to convince at least nine state utility regulatory bodies that they should approve Windstream's sale of the assets.  The rationale for approval: the Windstream operating subsidiaries effectively would lease the assets back and retain exclusive, long-term access to and control of them.   One of these documents that Fletcher drafted and signed, on behalf of Uniti and Windstream, was the application to the Alabama PSC, which was filed in Montgomery, Alabama on July 31, 2014.

55.      Windstream and Uniti described the transaction to the Alabama PSC in terms that made clear the proposed spinoff would result in a sale-leaseback transaction:

> The Subject assets will be transferred to [Uniti], which will lease the use of the Subject Assets back to Windstream for the benefit of the WIN Companies on an exclusive, long term basis so that the WIN Companies can continue to operate their telecommunications business as they do currently.   [Uniti] will not provide any transportation or public utility services to any customer in Alabama,

> nor will [Uniti] operate any of the Subject Assets or any
> transmission or switching facilities.  Rather, [Uniti] will simply own
> the Subject Assets and lease them exclusively for the WIN
> Companies.

56.     Kenny Gunderman, who worked closely with Windstream in developing and implementing the spinoff and sale-leaseback plan, was fully aware of Windstream's messaging about the transaction to state regulators.

57.     One state regulator, the Kentucky PSC, required that Windstream provide live testimony, subject to cross-examination, before approving Windstream's application.  During the November 13, 2014 hearing before the Kentucky PSC, Bob Gunderman admitted that although Windstream Holdings would be the signatory to the lease, the Windstream operating subsidiaries were the true parties in interest.  When asked whether "there [will] be an agreement between the Kentucky [operating subsidiaries] and [Uniti]," Bob Gunderman replied: "The agreement will be between CS&L at the corporate entity level as well as Windstream Holdings, Inc., and it's just for administrative ease in terms of transacting … the lease between the entities … for the benefit of the operating subsidiaries."

58.     At the same time that Fletcher, Bob Gunderman, and others were telling regulators like the Alabama and Kentucky PSCs that the Windstream operating subsidiaries would retain a leasehold right to access the assets, they knew that the structure they were describing was a direct violation of the Indenture.  As Fletcher testified during the Indenture Litigation:

> Q.     The question is, at the time that this transaction was being
> planned, you were aware that if the transferor subsidiaries [i.e., the
> Windstream operating subsidiaries] signed the master lease, that
> would have been a clear violation of the indenture at issue in this
> case.
>
> A.     Yes.

59.     Yet during the November 2014 hearing, Bob Gunderman affirmatively told Kentucky regulators that the contemplated spinoff and lease transaction would *not* violate any of Windstream's debt agreements or restrictive covenants.  He explained that "[a]s part of this transaction, [Windstream] ha[d] no concerns with any covenants within [its] indentures or [its] existing credit agreement."

60.     Windstream's scheme, adopted and implemented by Fletcher, Thomas, Bob Gunderman, and Kenny Gunderman, touting the structure to investors, while simultaneously trumpeting the safety, comfort, and simplicity of a direct Windstream sale-leaseback structure to state regulators, succeeded initially.

61.     Fletcher, Thomas, and Bob Gunderman were well-paid for their efforts.  In 2015, Thomas and Bob Gunderman each received cash bonuses more than 10 times larger than the cash bonuses they had received in 2014, and Fletcher received a cash bonus more than three times larger than his bonus in 2014.  The amount of cash bonuses paid to Fletcher, Thomas and Bob Gunderman each declined in 2016.

62.     Kenny Gunderman also was rewarded financially for his involvement.  In addition to the substantial fees earned by his firm, Stephens, Inc., in connection with the transaction, Kenny Gunderman parlayed his role into the CEO position of Uniti post-spinoff, receiving total compensation in excess of $6 million during his first year as CEO, and more than $5 million in each year since.

**Completion of the Spinoff: Windstream and Uniti Attempt to Walk the Knife's Edge**

63.     The hurdle of ensuring that Uniti would be treated as a REIT by the IRS, but Windstream's operating subsidiaries would maintain access to and control over the copper and fiber network assets post-spinoff, was addressed internally.  Fletcher, Thomas, and Kenny Gunderman began working on the Master Lease to be signed by Windstream Holdings and Uniti

at or immediately before closing the spinoff.  At all relevant times during the "negotiation" of the Master Lease, the officers of Windstream Holdings were also officers of Uniti.  Fletcher, lead of the "Windstream Group" during these "negotiations," was simultaneously General Counsel of both Windstream and Uniti.  Tony Thomas, lead of the "Uniti Group" during the "negotiations," was both CFO of Windstream and President and CEO of Uniti, and his fellow "Uniti Group" team member, Jeff Small, was himself a Windstream employee with a future at Uniti after the completion of the spinoff.[4]

64.     The Windstream operating subsidiaries are not parties to the lease, even though Fletcher, Thomas, and Bob Gunderman had told state regulators that the Windstream operating subsidiaries would be leasing the assets.  The operating subsidiaries could not execute the lease because that would be a clear violation of the Indenture.  Nevertheless, at all times, the operating subsidiaries would use the assets and pay all rent costs required under the lease.  Ultimately, Uniti would only receive payment from Windstream Holdings if the operating subsidiaries made payments to Windstream Holdings.

65.     Having settled on the creation of Windstream Holdings and the use of Uniti as "Captive," Windstream proceeded to seek board approval without going through the process of seeking consents or waivers from Windstream noteholders.  On August 6, 2014, Windstream's Vice President of Capital Markets and Investor Relations, sent an email to Tony Thomas, Bob Gunderman, and John Fletcher, among others.  This email reveals Windstream's strategy to avoid getting into details surrounding the structure's impact on the Notes:

> We do not believe that the Windstream indentures require any consents or waivers to effect the transaction (do not go into detail unless specifically asked on each point) . . . .  If pressed on sale-leaseback provision: Given that the lease is being implemented at

---

[4] *See infra* note 2.

Windstream Holdings, it does not impact any covenants in the Windstream indentures, including the sale-leaseback provisions.

66.     On March 25, 2015, the Windstream Board approved the 2015 Uniti Spinoff.  Thus, the pieces were in place to attempt to get around the restrictive covenants in the Indenture in the following way:  Windstream Corporation (now known as Windstream Services), which had borrowed billions of dollars in exchange for promising (in part) not to sell and leaseback its assets, would cause its operating subsidiaries to sell their assets to Uniti; Windstream Holdings, not directly restricted by the Indenture, would lease the assets from Uniti under the Master Lease; Windstream Services and the Windstream operating subsidiaries would use the assets and make payments to Windstream Holdings; and Windstream Holdings would make payments to Uniti under the Master Lease.  Because Uniti and Windstream shared officers at this time, and because Uniti's new CEO Kenny Gunderman had been Windstream's financial adviser during this transaction, Uniti knew, should have known, or recklessly disregarded the fact that there was at least a risk that this "house of cards" would tumble if challenged by Windstream noteholders.

67.     The Master Lease was signed in April 2015 by Kenny Gunderman on behalf of Uniti and by Thomas on behalf of Windstream.  In it, each party represents to the other that the lease does not constitute a material breach of any other agreement of such party.  This representation, when made, was false.  Kenny Gunderman and Thomas knew, should have known, or were recklessly indifferent to that fact at the time the lease was signed.

68.     The Master Lease also included several events of default, including (i) if any of the representations or warranties made by Windstream Holdings in the Master Lease proves to be untrue when made in any material respect and (ii) if any event or condition occurs that enables or permits holders of any material indebtedness (over $75 million) to cause that indebtedness to become due prior to its scheduled maturity.  Since the very structure of the spinoff and the Master

23

Lease involved at least two potential Indenture defaults (the sale-leaseback prohibition and the debt ratio covenant) – an opening Aurelius exposed in the latter part of 2017 – these events of default were triggered at the moment the lease was signed and delivered.  Kenny Gunderman and Thomas knew, should have known, or were recklessly indifferent to that fact at the time the Master Lease was signed.

69.     In the same way, Windstream and Uniti knew when the Master Lease was signed that how Windstream and Uniti characterized the sale-leaseback arrangement to state regulators described a direct violation of the Indenture's restrictive covenants prohibiting sale-leaseback transactions.  After all, Fletcher and other officers of both Windstream and Uniti signed, on behalf of Uniti and Windstream, nearly all the state regulatory filings that had described the spinoff as a sale-leaseback transaction.

### Recharacterization Risk

70.     Yet, despite characterizing their arrangement as a sale-leaseback to state regulators, Windstream and Uniti *also* knew that the arrangement carried with it an entirely separate risk: that the Master Lease could be "recharacterized" as not a lease at all, but instead as a financing arrangement, in which Windstream owned the network assets and Uniti simply provided financing to Windstream, ostensibly secured by those assets.  While Uniti has always disclosed the risk that the Master Lease could be recharacterized as something other than a "true lease," Windstream and Uniti never disclosed the true nature of that risk, nor their own involvement in helping create that risk.

71.     In fact, in a rather shocking moment of transparency, Windstream now claims that "no amount of legal structuring could deny the true financing nature of the arrangement." Windstream also claims that the structure of the lease term in the Master Lease (that it created *with*

24

Uniti) – an initial 15-year term with successive five-year renewals – and other terms of the spinoff transaction were actually "fig leaves" meant to obscure the reality of what the Master Lease is:  a financing, as impermissible under Windstream's indentures as a sale-leaseback transaction.  Now that it is in bankruptcy, Windstream has taken the position that it, not Uniti, is the true owner of the networks and has sought to recharacterize the Master Lease as a financing transaction.[5] Windstream has emphasized the following indicators that the transaction was actually a financing:

    a.  Windstream, the ostensible tenant under the Master Lease, actually bears all the risk related to the real estate.  Windstream must pay full "rent" even if the leased networks become compromised, deteriorate physically, *age to obsolescence*, or are otherwise impaired such that they cannot generate revenue to fund the rent.

    b.  The $650 million in "rent" that Windstream owed annually to Uniti was predetermined to provide a sufficient yield to attract equity investors to Uniti and was based on Uniti's projected capital needs to service its debt.  Unlike a normal "rent" that should decline as the networks Windstream was renting depreciated, the Master Lease includes a rent escalator.  This was done in an attempt to shoehorn the Master Lease into the framework of traditional real estate leases with traditional REITs.  In other words, in the structural quicksand that Windstream and Uniti created, the rent is not tied to the fair market value of the assets.

    c.  Windstream bears the burden under the Master Lease of making improvements to the networks, thereby paying to improve an asset it is purportedly leasing, an arrangement Windstream likens to a lessee paying to replace the engine in a leased vehicle.

---

[5] Windstream also argues in its bankruptcy that its above-market rental payments constitute ongoing fraudulent transfers.

d.  Windstream accounted for the transaction on its books as a "failed sale-leaseback transaction," with the "rent" split into principal and interest and the transferred assets remaining on Windstream's books.

72.  Windstream and Uniti went to great lengths to avoid these concerns and make the Master Lease appear to be a fair market lease that fit into the analysis of a "true lease." Stated another way, whether undertaking a true lease analysis or a fraudulent transfer analysis, the integrity of the entire transaction hinged on Windstream and Uniti each receiving true fair market value throughout all aspects of the transaction. While this requirement may seem elementary, transactions that are not at arms-length carry inherent dangers of misconduct from overeager internal players who can materially benefit from predetermined, manufactured outcomes that are inconsistent with financial markets.

73.  Here, Windstream and Uniti faced competing pressures: the need to have a fair market spinoff transaction versus the need to get the financial markets to invest in Uniti on the other side of the spinoff. As was discussed above, the financial market number had already been identified -- $650,000,000 a year was the number Uniti was going to receive from Windstream.[6]

74.  In order to make the lease conform with all of the competing demands, the fix was to have the assets being leased have a useful economic life that extended beyond their true life/value, thus supporting a longer-term lease at $650,000,000 per year (and increasing) for 15 years or more. Upon information and belief based upon the allegations of Windstream's complaint in the Adversary Proceeding and the Skadden "true lease" opinion, to get to this desired result,

---

[6] The assets identified did not support this annual payment over the amount of time necessary for Uniti to stand on its own and allow Windstream to upgrade its infrastructure. Thus, Windstream was put in a strange position: to improve its overall financial situation, it needed to place a higher-than-market value on the assets it transferred to Uniti so that, through the above-market rental payments, it could overpay Uniti for those assets.

Uniti provided inflated projections of the leased networks' remaining useful life and economic value, and then represented and warranted to its own outside advisors that these projections were reasonable.  But Uniti knew that the projections used were inflated.  These projections provided one of the bases for an extensive analysis from Uniti's counsel (Skadden, the same law firm that represented Windstream in the Master Lease negotiations) concluding that, because the assets would have a useful life beyond the initial term of the Master Lease and the first renewal term, the Master Lease would be treated for tax purposes as a "true lease."

75.     The inflated projections of remaining useful life and economic value were also the basis for an opinion by E&Y that the copper network (which constituted 80% of the network assets transferred to Uniti) had a total useful life in excess of 40 years.  Uniti knew that the useful life conclusion by E&Y was out of touch with reality and was contrary to other analyses that Windstream and Uniti executives had received, yet it provided the foundation for the Master Lease to be treated as a "true lease" because Uniti's lawyers, completing the construction of the "house of cards," relied on E&Y's conclusion in the "true lease" opinion delivered to Uniti.

Total Economic Life of Copper Wire



76.     The Windstream and Uniti executives who served on the "Windstream Group" and the "Uniti Group" during the Master Lease negotiations knew better.  As Windstream has alleged in its bankruptcy, Windstream had had other analysts examine the remaining economic life of copper cables, and those analysts had reached conclusions markedly different than E&Y's.  Duff & Phelps, for example, prepared depreciation reports of Windstream's copper wire networks and concluded as early as 2011 and 2012 that the remaining economic life of those copper wire cables was between 3.9 and 7.7 years.  Another analyst, CostQuest Associates, concluded in 2016 that the average remaining life for metallic cables was between 1.3 and 7.5 years, depending on the type of cable.  BCRI Valuation Services, in a 2015 Depreciation & Cost Manual, assigned a 4-7 year life for metallic cables.  These estimates were consistent with a projection made by the FCC *in 1994* – when copper wire cables were still viable for the foreseeable future – that the total life of metallic cables, such as a copper, was 25 to 30 years, i.e. until approximately 2024.

77.     As Windstream has alleged in its bankruptcy, Windstream's own accounting department depreciated its copper wire cables over 20 years, a treatment that it recognizes is "on the longer side of actual expectation."  As a comparator, another publicly-traded telecom company, FairPort Communications, Inc., reported in its Form 10-K filed on March 9, 2012, that the estimated useful life of its copper wire assets was just 15-18 years.

78.     Despite its own accounting policy, when Windstream requested a private letter ruling from the IRS in 2013 regarding the REIT spinoff, Windstream represented to the IRS that the copper wiring to be distributed to Uniti had a useful life of "approximately 30 to 40 years."  Parroting this inflated useful life treatment, Uniti subsequently stated in its Information Statement to shareholders in connection with the 2015 spinoff that its copper wiring had a useful life of 7-40 years.  This statement was false and misleading.  Uniti knew that the actual useful life was much

shorter than the upper end of the range that it disclosed in the Information Statement. Three years later, without explanation, Uniti, slashed the useful life of its copper wiring to 20 years in its Annual Report on Form 10-K for the year ended December 31, 2017.

79.     When he was serving on the "Windstream Group" during the Master Lease negotiations, John Fletcher – General Counsel to both Windstream and Uniti – knew, or should have known, that Windstream's representations to the IRS and Uniti's representations in its Information Statement in connection with the spinoff about the copper wire cables could not be squared with these analysts' conclusions about remaining useful life of copper wire cables, or with the initial term of the Master Lease and the follow-on five-year renewal terms.

80.     Enter: E&Y. E&Y's analysis of the residual value of the networks concluded that the networks collectively would retain 33% of their closing date value at the end of the initial 15-year Master Lease term. E&Y also concluded, based in part on Uniti's inflated projections, that the leased networks would retain approximately 46% of their remaining economic life at the end of the initial 15-year Master Lease term. Uniti either provided the projections upon which E&Y relied, or, alternatively, Uniti knew or should have known the projections were inaccurate and unsupportable.

81.     E&Y's conclusion was not in line with facts known about copper cable networks in 2015, facts that were known to executives at Windstream and Uniti experienced in the industry, such as John Fletcher and Kenny Gunderman. By 2015, for example, it was already clear that copper wire cables could not keep up with market demand for faster internet speeds. Copper wires might still work, but in 2015 they were the wagon wheels of an earlier day – rapidly approaching obsolescence, and thus the end of their economic life.

82.     In stark contrast to its early efforts to claim a longer economic life, Windstream now represents in its bankruptcy that "for many locations, Windstream's copper will be uncompetitive on or around 2025," i.e., with about five years to go on the initial Master Lease term, and 25 years left on the Master Lease with extensions.

83.     Uniti leadership knew of these and other potential issues associated with the 2015 Uniti Spinoff.  Kenny Gunderman, Uniti's President and CEO, served as a financial advisor to Windstream before the spinoff and has publicly taken credit for crafting the spinoff transaction. He also advised Windstream during the "negotiation" of the Master Lease and, by virtue of his positions at Uniti, certifies Uniti's SEC filings.

84.     John Fletcher has admitted that Windstream Holdings was the only Windstream entity to sign the Master Lease because Windstream sought to avoid "a clear violation" of the Indenture.   In other words, Windstream's General Counsel—and Uniti's former General Counsel—has acknowledged that Uniti knew that the spinoff and the Master Lease were at risk of violating the Indenture.  Having Windstream Holdings be the only Windstream entity to sign the Master Lease was an attempt to hide these risks.

85.     Uniti executives, including Kenny Gunderman, also knew that Uniti's lawyers at Skadden had provided a lengthy analysis of the Master Lease and concluded that it was a "true lease."  But the Skadden opinion highlighted the risky nature of the transaction, a knife-edge with economic disaster for Windstream (and therefore for Uniti) on either side.  Skadden recognized that the IRS "may argue that the proposed lease is merely a financing arrangement and that the purported lessor [Uniti] is, in substance, a secured creditor but holds no equity interest in the property."  Skadden's opinion letter correctly anticipated the argument that the Master Lease is really a financing arrangement, but instead of the IRS, it is Windstream itself (Skadden's client in

the 2015 Uniti Spinoff) that is now advancing in its bankruptcy the position that the Master Lease is a financing.  Skadden's "true lease" opinion also expressly relied on E&Y's useful life projections that Uniti knew to be inflated and unreasonable.

86.    Skadden's analysis also warned of the exact thesis that Aurelius would later use to declare an event of default on Windstream's Notes – that the economic substance of the 2015 Uniti Spinoff was analogous to a sale-leaseback transaction.  In fact, Skadden concluded:  "the Spin-Off and Master Lease involve a contribution of property to [Uniti] by Windstream and a leaseback of those properties from [Uniti] to Windstream.  Thus, there is a transfer of legal ownership of the Distribution Systems followed by a leaseback of that property that could be viewed as similar to a sale-leaseback arrangement."

87.    Skadden's "true lease" opinion thus identified for Uniti management both the very risk that ultimately brought Windstream to bankruptcy, and the argument Windstream is now advancing in that bankruptcy to re-characterize the Master Lease as a financing.  These undisclosed risks put Uniti shareholders in a position to be invested in a company that is on the verge of losing well over 60% of its annual income.  Rather than disclosing the risks highlighted by Skadden, Uniti kept quiet about them during discussions with SLF.  Moreover, Kenny Gunderman and Uniti executives touted the "iron-clad" dividend that SLF could expect because of the Master Lease.  Even after Aurelius had claimed Windstream was in default, Kenny Gunderman maintained the charade, assuring investors at a November 2017 event that Uniti "continue[d] to be highly confident" in the Master Lease, which he misleadingly claimed had been "blessed by very reputable law firms[.]"

88.    Skadden's opinion alerted Uniti's executives to another risk of the 2015 Uniti Spinoff:  that while the 2015 Uniti Spinoff involved the transfer of ownership of miles of fiber and

copper cable, Windstream did not transfer title to various easements, permits and pole attachment agreements to Uniti.  In testimony to the Alabama Public Services Commission, as part of the attempt to gain approval for the transaction, John Fletcher told the Alabama PSC that "[Uniti] will simply own the Subject Assets and lease them exclusively for the WIN Companies."

89.     That statement was false and misleading, as Fletcher knew from the Skadden opinion.  In fact, legal title in the easements, permits, and pole attachments – the assets that could arguably turn personal property like wires and cables into real property that could support a REIT – remained with Windstream.

90.     Then, at or about the time Uniti was spun off, Windstream and Uniti systematically set about to remove the main direct-knowledge participants of the fraudulent behavior used to obtain REIT approval from regulators and financial markets.  Key players in the scheme, such as Fletcher and Thomas, were removed from their positions at Uniti and employed (or re-employed, as the case may be) solely by Windstream.  Thomas was removed as President of Uniti and replaced with Kenny Gunderman.  Fletcher was removed as General Counsel at Uniti and replaced by Daniel Heard.

91.     While Uniti had finally gotten itself up and running, Windstream was at this point its only customer, presenting Uniti with a different issue of financial stability.  Uniti knew, and the financial markets insisted, that it immediately needed to diversify its revenue stream.  Also, because Windstream operated its own assets, and Uniti was really only a leasing company for assets it did not operate or even know how to operate, Uniti needed a management team that was capable of actually operating a telecom business.

## II.      Uniti makes material public false and misleading statements about Windstream.

92.      Following the spinoff, Uniti made a series of public false and misleading statements about Windstream, the spinoff, and the sale-leaseback in its public disclosures.  Uniti repeatedly claimed that Windstream Holdings was the lessee of the copper and fiber network assets that Uniti had acquired from the Windstream operating subsidiaries, and repeatedly touted Windstream's viability and ability to make "rent" payments for use of those assets under the purported Master Lease.  But Uniti studiously and misleadingly avoided disclosing either the risk that the Master Lease was actually a prohibited sale-leaseback between Uniti and the Windstream operating subsidiaries, in violation of the Windstream Indenture's restrictive covenants, or alternatively, the true extent of the risk that the Master Lease was not a lease at all, but instead a financing arrangement, which would also have violated the Indenture's leverage ratio covenant.  Covering up the true extent of the risk that the Master Lease was actually a financing arrangement was very important, because if Uniti did not actually own even the network assets, that would call into question Uniti's very ability to continue to be treated as a REIT for tax purposes.

93.      For example, Uniti's initial Information Statement describing the spinoff to shareholders was attached to a Form 8-K signed by Kenny Gunderman as Uniti's first post-spinoff President and CEO, and filed with the SEC on March 26, 2015.  In it, Uniti explained that after the spinoff, "the Distribution Systems," *i.e.*, the copper and fiber network assets Uniti acquired from the Windstream operating subsidiaries, "will be leased to *Windstream Holdings*" pursuant to the Master Lease.

94.      This statement, however, was false or misleading.  Uniti made no mention of the fact that it had told state regulators that the operating subsidiaries would have leasehold access to the assets, or that the Master Lease arrangement—wherein Windstream Holdings was the

ostensible lessee, but the Windstream operating subsidiaries were the *de facto* lessees—violated the Indenture, or that the assets themselves remained on Windstream's books for accounting purposes.  Uniti also did not disclose the true extent of the risk that, because the Master Lease depended on an inflated useful life of the copper wires that made up the lion's share of the spin-off assets, a more realistic useful life for those assets would make it much more likely that the Master Lease would be recharacterized as a financing arrangement.

95.     Later in the Information Statement, Uniti disclosed the fact that the structure of the spinoff and arrangement had been affected by certain of Windstream's restrictive covenants in its debt agreements.   Specifically, Uniti disclosed that due to restrictive covenants in its debt agreements, Windstream had retained ownership of some of its copper and fiber network assets, and had not sold those assets to Uniti:

> In order to comply with restrictions under Windstream's debt agreements and to minimize the number of states in which regulatory approvals of the Spin-Off were required, Windstream will retain ownership of certain distribution systems in select states. Windstream will continue to operate the distribution systems that it owns and those that it leases from parties other than CS&L. Windstream has selected assets for inclusion in the Spin-Off which it believes provide CS&L with sufficient scale and geographic diversity to meet the business purposes for the Spin-Off described above under "Reasons for the Spin-Off."

96.     This disclosure was false or misleading.  The restrictive covenants to which this disclosure refers were not the Indenture's prohibition on sale-leaseback transactions under Section 4.19.  Instead, they were other restrictive covenants, such as the "Restricted Payment" covenant under Section 4.07, the Mergers covenant under Section 5.01, and the Change of Control covenant under Section 4.14.  By disclosing the effect of certain of the Indenture's restrictive covenants on the deal structure, while studiously avoiding mention of Section 4.19's prohibition on sale-leaseback transactions involving the Windstream operating subsidiaries, Uniti misleadingly

obscured the risk that the spinoff and sale-leaseback could have violated Section 4.19.  Similarly, by disclosing the effect of certain of the Indenture's restrictive covenants on the deal structure, without even mentioning Section 4.09's leverage ratio covenant, Uniti misleadingly obscured the risk that the Master Lease could be deemed a financing arrangement, which would result in Windstream's breach of Section 4.09's leverage ratio covenant.

97.     Indeed, at the time of the spinoff and sale-leaseback, the market was entirely unaware of the risk that the Master Lease could violate the Indenture's prohibition on sale-leasebacks, as reflected in an August 13, 2014 report by Covenant Review titled "Windstream: How Would the Bond Covenants be Implicated by the Proposed REIT Spin-Off."  In that report, Covenant Review tracked the covenants disclosed by Uniti and analyzed the likelihood that the spinoff would result in a violation of the restrictive covenants found in Section 4.07 (Restricted Payments), Section 4.14 (Change of Control), and Section 5.01 (Merger) of the Indenture.  But the analyst was unaware even of the possibility that Section 4.19's prohibition on sale-leaseback transactions could be violated, because that risk was not disclosed.  And the analyst was also unaware of the true risk that the terms of and assumptions underlying the Master Lease, especially the inflated projections of the useful life of copper wire, were such that it was not a "true lease" at all, and instead, a financing arrangement, which would result in Windstream's violation of Section 4.09's leverage ratio covenant.

98.     In the Information Statement, Uniti also acknowledged in its disclosure of risk factors that it was dependent on Windstream's financial performance.  It elected to state:  "We will be dependent on Windstream Holdings to make payments to us under the Master Lease, and an event that materially and adversely affects Windstream's business, financial position or results of

operations could materially and adversely affect our business, financial position or results of operations."

99.     But this statement was also false or misleading, because Uniti failed to fully disclose the risks, including that a sequence of events had already occurred that posed an existential threat to Windstream's business, financial position, and results of operations: the sale-leaseback transaction – or, depending on how it was characterized, a financing transaction – either of which was prohibited by Windstream's Indenture.   The threat to Windstream's business, financial position, and results of operations also posed a threat to Uniti's ability to continue to qualify as a REIT.   Any threat to the continued viability of the Master Lease is magnified in a REIT; if 75% of its gross income does not come from real estate, the entire REIT structure fails.

100.     Finally, Uniti publicly extolled the financial *stability* of Windstream, without cautioning about the risk that the Master Lease would be found to violate the Indenture and the threat that risk posed to Windstream's business – and, by extension, Uniti's.   In the same public filing, under the heading "Financially Secure Tenant" in the Information Statement, Uniti stated: "Immediately following the Spin-Off, Windstream will be our only tenant. … For the year ended December 31, 2014, Windstream generated annual revenue of approximately $5.8 billion and net cash from operations of $1.5 billion. Windstream's liquidity position, modest leverage and ability to generate significant free cash flow should provide it with the ability to pay the annual lease obligations to CS&L [*i.e.*, Uniti] for the foreseeable future."

101.     This statement was also false or misleading.   Uniti did not publicly state (or later disclose to SLF) that (at least some of) its leaders knew, should have known, or were recklessly indifferent to the fact that there was a risk that Windstream was already in violation of the Indenture, putting Windstream's (and Uniti's) continued viability in jeopardy.   On the contrary,

Uniti's public statements following the spinoff continued to tout Windstream's financial stability, without mentioning the risk that the entire sale-leaseback arrangement could be a breach of the Indenture's restrictive covenants.

102.    All of the foregoing false or misleading statements from Uniti's initial Information Statement were also contained in earlier iterations of the Information Statement, which were filed with the SEC as attachments to: (1) a Form 10 filed by Uniti on October 24, 2014, and signed by Thomas as CEO of Uniti; (2) Amendment No. 1 to the Form 10 filed on December 22, 2014, and signed by Fletcher as General Counsel of Uniti; and (3) Amendment No. 2 to the Form 10 filed on February 10, 2015, and also signed by Fletcher.

103.    Moreover, Uniti's false and misleading characterization of the Master Lease and its relationship with Windstream, as well as Uniti's overstated confidence in Windstream's financial condition, continued well after the transactions were complete.  For example in its Form 10-K for Fiscal Year 2017, which was signed by Kenny Gunderman and filed on February 23, 2017, Uniti misleadingly characterized Windstream Holdings as the "lessee of the Distribution Systems pursuant to the Master Lease," without disclosing that the Windstream operating subsidiaries were the *de facto* lessees, just as Uniti had admitted to state regulators, and without disclosing even the risk that Windstream violated the Indenture.  Uniti also failed to disclose the impending risks associated with the knowingly inflated asset valuation of copper wire.

104.    In Uniti's Q3 2016 Earnings Call on November 14, 2016, Kenny Gunderman explained that Uniti would be more than willing to consider engaging in "***additional sale-leaseback options*** with Windstream."  This disclosure of Uniti's willingness to consider additional sale-leaseback options misleadingly implied that there was no legal risk that such "sale-leaseback

options" could be prohibited by the Indenture's restrictive covenants, and misleadingly implied the same as to the spinoff and sale leaseback that occurred in 2015.

105.    In Uniti's Form 10-K for Fiscal Year 2015, which was signed by Kenny Gunderman and filed on March 7, 2016, Uniti stated that "Windstream, as our anchor tenant, provides us with a base of stable and highly predictable rent revenues as an initial platform for us to grow and diversify our portfolio and tenant base."  In a March 16, 2016 teleconference with investors hosted by Citi, Kenny Gunderman stated that "the concerns about Windstream's credit quality are way overdone, and we have said that from the beginning.  I think when you look at their performance over the past several quarters, you have seen continued stability and upward trajectory of that business, and we think that is going to continue over time."  These disclosures touting the "stability" of Windstream's business and characterizing Windstream's rent revenues as being "stable and highly predictable" were false or misleading, given Windstream was teetering on a knife-edge between violation of either the Indenture's restrictive covenant prohibiting sale-leaseback transactions or the Indenture's debt ratio covenant.  Further, there was no disclosure of the knowingly inflated asset valuation that saddles Windstream with above-market rental payments.

106.    Similarly, in Uniti's Q4 2016 Earnings Call on Feb. 23, 2017, Mark Wallace, Uniti's CFO and Treasurer, stated that Uniti was "extremely pleased with Windstream's performance" and acquisitions, but misleadingly failed to mention the risk that Windstream was in violation of at least one of the Indenture's restrictive covenants.

107.    At a JPMorgan Investor Event on May 24, 2017, in response to a question about the volatility of Windstream's stock price, Mark Wallace touted Windstream's viability:

> [W]e have a lot of confidence in Windstream.  I think the management team has done a great job over the last couple of years

since our spin-off. And whether it's selling assets or restructuring their debt or repricing their debt and taking cost out of the business. And as I understand it, they continue to seek to take costs out of the business. And I think the acquisitions that they've announced, both EarthLink and [Broadview], will be accretive and enhancing for them, which is actually very good for us. So anytime that the financial profile of Windstream improves and the cash flow improves and the credit profile improves, that's certainly good news for us. And I suspect that, that will continue to happen as they realize synergies, those acquisitions continue to produce the returns that they're expecting and they -- and Tony continues to take the interconnection cost out of the business as well.

108.   All of these statements touting Windstream's financial stability and expressing a preference by Uniti to engage in more sale-leaseback arrangements with Windstream were misleading because they failed to disclose the risk that Windstream had breached the Indenture by entering into the Master Lease (or financing arrangement), and the threat that Windstream's breach of the Indenture posed to Windstream's – and Uniti's – ability to operate as a going concern.

109.   These false and misleading statements and omissions were certainly material to investors. As Uniti knew, its value was heavily dependent on revenue from Windstream. In fact, since the spinoff, Windstream has accounted for at least two-thirds of Uniti's annual revenue. Before the completion of the Southern Light sale, on February 23, 2017, Uniti filed its Form 10-K for the year-ended December 31, 2016. In the 10-K, Uniti highlighted the risks that Windstream represented a significant portion of its business and that Uniti's success depended significantly on the viability of Windstream. Uniti made numerous statements about the importance of Windstream, which it described as its "anchor tenant" that "provide[d] [Uniti] with a base of stable and highly predictable rent revenues as an initial platform for us to grow and diversify our portfolio and tenant base." Uniti also acknowledged its "dependen[ce] on Windstream Holdings to make payments to us under the Master Lease, and an event that materially and adversely affects

Windstream's business, financial position or results of operations could materially and adversely affect our business, financial position or results of operations."

110.    Uniti further disclosed, pursuant to Item 303 of Regulation S-K, that because Windstream represented a substantial portion of Uniti's revenue, Uniti "monitor[ed] the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments."  But Uniti did not disclose to investors the biggest risk of all to Windstream's credit profile: the risk that Windstream was in default of the Indenture's restrictive covenants as a result of the Master Lease.

111.    Uniti's internal discussions show the misleading nature of its public statements.  In sharp contrast to Uniti's public statements, Windstream was so concerned internally about the propriety of this transaction that, on or about April 12, 2015, Windstream CFO and Treasurer Bob Gunderman circulated to his brother Kenny Gunderman, and others, talking points to address how the Master Lease and the Windstream relationship should be publicly discussed.  In that email, Bob Gunderman explained that Kenny Gunderman, Uniti's President and CEO, would "reinforce the message" about the 2015 Uniti Spinoff to "holdout[ ]" accounts.  Those talking points advised, for example, a certain response to the question "[w]hy is the lease with WIN Holdings VS WIN Services?"  If asked that question, the talking points directed Kenny Gunderman and Windstream's executives to obfuscate the truth: "[t]his is a complex transaction and after considering many factors we concluded that having the lease at WIN Holdings was the best structure."  And "[i]f

pressed," they were only to identify "[f]actors evaluated," including "corporate structure, tax, accounting, [and] debt."  This was consistent with Windstream's earlier strategy, reflected in an email from Windstream's Vice President of Capital Markets and Investor Relations on August 6, 2014, for management to avoid getting into details surrounding the structure's impact on Windstream's Notes.

112.    And absent from those talking points was the true reason for having the "HoldCo" structure—a fraudulent attempt to avoid a "clear violation" of the Indenture.  At the time of the spinoff, Windstream and Uniti executives knew of the steps that had been taken to obfuscate the risk that the spinoff and Master Lease structure violated the Indenture's restrictive covenants.  In their public statements, Uniti executives failed to disclose their knowledge that the 2015 Uniti spinoff and sale-leaseback transaction violated, or risked violating, the Indenture's restrictive covenants.

113.    Windstream certainly did not encourage Kenny Gunderman or Windstream's representatives to disclose these facts—even "if pressed" about the reasons that Windstream Holdings, a non-operating holding company, had signed the Master Lease instead of Services.

III.    **Uniti induces SLF to purchase stock through its acquisition of Southern Light.**

**Southern Light Network and Operations**

114.    Mobile, Alabama-based Southern Light was formed in 1998.  By mid-2016, it owned a regional fiber network across the Gulf Coast comprising nearly 540,000 fiber strand miles and employed hundreds of people in the Mobile area.  Around that same time, telecommunication consolidation was heating up.  As a result, in mid-2016 Southern Light's sole owner, SLF, decided it would test the market to see if anyone would be interested in purchasing its operating subsidiary, Southern Light.

115.    On or around October 14, 2016, SLF had a preliminary meeting with Uniti (which, for the entirety of the negotiations, was negotiating and making representations on its own behalf and on behalf of Uniti Fiber).  This meeting was an informational session about Uniti, discussing its history, background, and structure.  The 2015 Uniti Spinoff came up during that meeting and subsequent discussions in which Uniti representatives touted the REIT and spinoff as a cutting-edge transaction that uniquely positioned Uniti as an industry thought leader.

116.    Uniti management, and in particular Kenny Gunderman (who also was representing Uniti Fiber in his negotiations with and representations to SLF), also emphasized at the October 14 meeting that the Master Lease was very favorable to Uniti and that the stability of Windstream as a customer would allow Uniti to pay an "iron-clad" dividend over time.  Uniti also represented to the members of SLF that the stream of payments to come from Windstream during the initial 15-year term of the Master Lease was a particular strength of its business.  Uniti represented to SLF's members that it was a S&P 400 mid-cap company with an enterprise value of approximately $9 billion.  Virtually all this enterprise value consisted of the lease payments from Windstream over the initial 15-year term of the Master Lease.  This fact made candor from Uniti about the risks to the Master Lease structure even more important.

117.    Uniti's representations were false and misleading because Kenny Gunderman and the other Uniti executives present at the meeting knew, or should have known, that the structure they were describing was really a "house of cards."  The structure existed only because Uniti's economically unsupportable projections of useful life of the copper wire network had resulted in E&Y's outlier opinion about residual economic value and ultimately in Skadden's "true lease" opinion.

118.    Kenny Gunderman also emphasized to SLF's members the brilliance of Uniti's REIT structure, noting that Uniti was the only REIT of its kind and that the window to create similar, competing REITs had been closed by the IRS.  Gunderman also noted that the REIT structure was important because the employees who knew how to operate telecommunications infrastructure remained at Windstream.  As a result, there was a significant gap that Uniti needed to fill with a true telecommunications management team (in addition to Uniti's existing REIT management team).

119.    Although Uniti touted the benefits of the 2015 Uniti Spinoff to lure SLF to accept Uniti stock during the sale of Southern Light, it wrongfully withheld and omitted important facts, such as that (i) the spinoff was a sale-leaseback transaction and thus the Windstream operating subsidiaries were in violation of the Indenture, (ii) Uniti knew of the risk that the earlier spinoff and signing of the Master Lease had violated the Indenture; (iii) the Master Lease contained a material misrepresentation and Windstream was in default under it at signing, (iv) Windstream and Uniti had disclosed to state regulators that, although Windstream Holdings was the nominal signatory to the Master Lease, the Windstream operating subsidiaries would be the *de facto* lessees under the Master Lease, while disclosing to the market just the opposite, and (v) the useful life of the assets transferred to Uniti had been grossly inflated.

120.    Uniti also represented and warranted to SLF that Uniti had obtained all necessary consents for it to acquire the Southern Light membership interests, and it listed those consents in Schedule 4.3 to the April 7, 2017 Membership Interests Purchase Agreement ("Purchase Agreement").  This representation and warranty was false, SLF has now learned:  Windstream has asserted in its bankruptcy that its consent was required in order for Uniti to acquire Southern Light,

a "Competitor" under the terms of the Master Lease, and that Uniti did not obtain Windstream's consent.

121.    Section 18.2 of the Master Lease prohibits Uniti from "merg[ing] or consolidat[ing] with or into a Competitor (whether directly or through Landlord's Subsidiaries)" without Windstream's consent.  Windstream claims Southern Light was a "Competitor" under the Master Lease because Southern Light was "engaged in any business activity then actively being conducted by [Windstream Holdings] or its Subsidiaries or any business that [Windstream Holdings] or any of its Subsidiaries has engaged in during the preceding one-year period within any state in which [Windstream Holdings] or any of its Subsidiaries is licensed as an incumbent local exchange carrier or competitive local exchange carrier."  Uniti Fiber is a subsidiary of Uniti, and Uniti Fiber consolidated with Southern Light by acquiring Southern Light's membership interests.

122.    The very fact that Uniti was talking to SLF about acquiring Southern Light suggested that Uniti had the right to do so, as did Uniti's public statements that it intended to "grow and diversify [its] portfolio and tenant base."  SLF undertook its negotiations with Uniti with that understanding.  But SLF did not rely on appearances and Uniti's public statements only:  SLF obtained a representation from Uniti that all necessary consents had been obtained, and SLF executed the Purchase Agreement in reliance on Uniti's representations and warranties, including that Uniti had consent from Windstream, if necessary, to undertake the transaction.  SLF would not have executed the Purchase Agreement absent Uniti's representation that it had obtained all necessary consents.

123.    Neither Gunderman nor anyone else at Uniti disclosed to SLF that Windstream's consent was necessary and had not been obtained, or that due to a lack of consent the acquisition of Southern Light might violate the Master Lease.  To the contrary:  Uniti represented to SLF in

the Purchase Agreement that entering into the purchase of Southern Light's membership units did not require consents material to Uniti (Section 4.3) or violate material agreements (Section 4.4).

124.   Windstream's position that Southern Light was a "Competitor" is used to support Windstream's overall goal of re-characterizing the Master Lease as a financing, which would presumably help Windstream emerge from bankruptcy but would be a devastating result financially to Uniti.

125.   With none of these various risks disclosed, Uniti sent an initial bid to Southern Light on November 3, 2016, but its bid was not selected.  After some initial diligence, the other potential Southern Light purchaser was unable to close within a 30-day exclusivity period.  Uniti, which had expressed its disappointment in November that its initial bid was not selected, reached out to SLF in mid-November 2016 to check on the status of the originally selected bid.  In mid-December 2016, after the exclusivity period with the original bidder expired, SLF told Uniti that it would entertain a new or higher bid.  SLF insisted, however, that the bid needed to be all cash. SLF's Lee Wallace confirmed to Uniti's Kenny Gunderman the all-cash preference in an email on December 19, 2016.

126.   At that time, and over the next few weeks, Kenny Gunderman endeavored to persuade SLF that stock should be part of the transaction.  In particular, Uniti wanted SLF to accept membership interests in Uniti Group LP.  The membership interests in Uniti Group LP would be exchangeable by SLF on a 1:1 basis for shares of Uniti Group, Inc. common stock or their cash equivalent value, at the election of Uniti.  Membership interests in Uniti Group LP thus would have the same value as shares of Uniti Group, Inc. common stock.

127.   On December 20, 2016, Kenny Gunderman, as President of Uniti, acknowledged that he "underst[ood]" SLF's request for an all-cash deal but countered that he "like[d] having

stock in the deal because it ma[de] [him] feel better about the diligence process given there is some shared interest."  A partial-stock deal instead of an all-cash transaction, Kenny Gunderman insisted over the course of negotiations, would also (i) free cash for other acquisitions that Uniti needed to make; (ii) provide general deal comfort to Uniti and its investors; and (iii) send a strong public message to the broader financial markets about SLF's faith in Uniti.

128.    For a few weeks thereafter, SLF worked in good faith with Uniti and Kenny Gunderman to brainstorm ways to include stock consideration that could also address Uniti's cash, investor, and market concerns, while simultaneously meeting SLF's desire to avoid Uniti market risk post-closing.  For example, SLF suggested in early January that it would consider taking a high percentage of stock if that stock could be sold by SLF at or immediately after the closing.  SLF also suggested at that time that it would consider taking stock if it also received the contractual right to sell that stock to another at a set price (*i.e*., if it could get a put option).  Uniti, however, rejected any and all of these same-as-cash type proposals and started insisting that the stock would have to be held for a certain period of time after closing to truly satisfy Uniti's needs, including its cash and market-message needs.  During all of these discussions, and despite Uniti's and Kenny Gunderman's knowledge that SLF was trying to avoid Uniti market risk, they never disclosed Uniti's biggest market risks: (1) Windstream's violation of the Indenture's restrictive covenants, either the one prohibiting sale-leaseback transactions or the one prescribing a certain debt ratio and (2) the possibility that the whole structure, including Uniti's status as a REIT, could unravel if the inflated projections of copper wire's useful life were questioned.

129.    Through various terms sheets and proposals that were circulated between December 20, 2016 and January 12, 2017, Uniti and SLF were unable to find a mutually acceptable stock consideration arrangement.  On January 12, 2017, SLF circulated the first draft of a

Membership Interests Purchase Agreement ("Purchase Agreement") to Uniti. That document continued to reflect SLF's position that consideration for the acquisition should be all-cash. Over the next several months, through the Purchase Agreement drafting process, Uniti responded and continued to push stock consideration. In those multiple turns of the Purchase Agreement, Uniti never disclosed the risk that Windstream could default on its Notes, or the true extent of the risk that the Master Lease was subject to re-characterization as a financing arrangement.

130.    While other terms of the Purchase Agreement were being negotiated through document turns, SLF decided to temporarily table the partial-stock discussions with Uniti and started to perform due diligence related to Uniti's stock to determine whether it was willing to accept Uniti market risk. SLF's diligence over the next several months included reviewing and relying upon Uniti's public filings and statements, including all of the filings and statements discussed above. Uniti knew that the company's value was heavily dependent on revenue from Windstream. Indeed, at the time of these negotiations, approximately 80% of Uniti's revenue came from Windstream, so any "event that materially and adversely affect[ed] Windstream's business, financial position or results of operations could materially and adversely affect our business, financial position or results of operations." Uniti's public filings disclosed certain risks to Windstream's credit profile. But as discussed above, Uniti's public statements did not disclose the risk that Windstream was in default of the Indenture's restrictive covenants as a result of the Master Lease.

131.    Nor did Uniti disclose that risk to SLF at any point during the parties' negotiations. Despite its knowledge that Windstream was, or at least potentially was, in violation of the Indenture and that Windstream, as Uniti's largest customer, was the greatest driver of the value of Uniti's common stock, Uniti failed to disclose any facts about those material risks to SLF—even

as Uniti's Kenny Gunderman actively encouraged SLF to accept Uniti stock equivalents, instead of SLF's preferred all-cash transaction.

132.    Unaware of the material risks that the 2015 Uniti Spinoff and signing of the Master Lease violated the Indenture in a variety of different ways, and unaware that the Windstream operating subsidiaries were therefore at risk of default and the resulting acceleration of hundreds of millions of dollars of notes, SLF, on April 7, 2017, signed the final Purchase Agreement, whereby Uniti would acquire SLF's assets in exchange for approximately $635 million in cash and $65 million in Uniti stock equivalents (the "2017 Transaction").

133.    SLF would not have agreed to accept payment in Uniti stock equivalents had Uniti disclosed any of these material risks to SLF, including the material risk that the Master Lease was a prohibited sale-leaseback transaction under the Indenture or the true extent of the material risk that the Master Lease was not a "true lease" at all, but instead a financing arrangement, which would have violated not only the Indenture's leverage ratio covenant, but would also have threatened Uniti's ability to continue to receive favorable tax treatment as a REIT.

134.    In the Purchase Agreement, Uniti agreed that, following the Closing, it would file a Prospectus supplement with the Securities and Exchange Commission.  In Section 5.23 of the Purchase Agreement, Uniti represented and warranted that "as of the date of the Prospectus and any amendment or supplement thereto, the Prospectus will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading."

135.    On July 3, 2017, Uniti filed a Prospectus supplement with the Securities and Exchange Commission.  The Prospectus supplement incorporates by reference an extensive list of

Uniti's prior SEC filings.  The filings Uniti incorporated by reference include, among others, Uniti's Annual Report on Form 10-K for the fiscal year ended December 31, 2016 filed with the SEC on February 23, 2017.  By incorporating this document by reference, the Prospectus supplement contained false and misleading statements and omitted to include material facts necessary to make the statements therein not misleading, as required by Section 5.23 of the Purchase Agreement.

136.    SLF received a draft of the Prospectus supplement before the closing of the 2017 Transaction, on or about June 30, 2017.  SLF relied on the accuracy of the Prospectus supplement, and the truthfulness and completeness of the filings incorporated by reference in the Prospectus supplement, when it decided to go forward with the closing of the 2017 Transaction.

137.    Uniti's purchase of Southern Light from SLF closed on July 3, 2017, and at that time, SLF received its Uniti stock equivalents.  SLF had substantially relied on, and had been given no reason to doubt the accuracy, or the fullness, of Uniti's public or private disclosures.

## IV.    The Fraud Is Revealed

### Litigation between Aurelius and Windstream

138.    Much to SLF's surprise (and later to its extreme detriment), mere weeks after closing on the 2017 Transaction, questions about the 2015 Uniti Spinoff started to circulate. For example in early August of 2017, Windstream became aware of market rumors that Aurelius was buying Notes to obtain a 25% position and also buying a significant position in credit default swaps (a short position, betting on Windstream to default).  The speculation was that Aurelius believed that Windstream had violated the Indenture by engaging in the spinoff and sale leaseback.  These market rumors were reflected in a September 5, 2017 report issued by Covenant Review, which discussed the "recent market speculation that the separation of the Uniti business from

Windstream's remaining businesses may have violated the Asset Sales covenant of the various Windstream bonds."

139.    As a result of these rumors, Uniti's stock started to slide.   On July 3, 2017, when SLF accepted the $65 million in Uniti's stock, the price was $25.26.  At the end of July, with a new management team in place and an increased revenue portfolio, it had inched up to $26.23. But after rumors and short positions came into play in early August, by August 31, 2017 the stock had dropped to $19.42.

140.    On September 21, 2017, Aurelius, a beneficial owner of more than 25% of the aggregate principal amount of the outstanding Notes, gave written notice to Windstream that the 2015 Uniti Spinoff and the associated sale-leaseback transaction constituted a prohibited "Sale and Leaseback Transaction" under the Indenture, and that Windstream was in violation of the Indenture's restrictive covenants.

141.    A few days later, Windstream acknowledged in a public filing that it received the Notice of Default, confirming to the market the previously-undisclosed risk that the spinoff and Master Lease amounted to a prohibited sale-leaseback transaction.  But Windstream denied that any default had actually occurred.  In a Form 8-K filed on September 25, 2017 at 4:09 PM ET, Windstream attempted to put its investors—and, by extension, Uniti's investors, like SLF—at ease, by stating:

> [o]n September 22, 2017, Windstream Services, LLC … received a purported notice of default dated September 21, 2017…. The Notice alleges that the transfer of certain assets and the subsequent lease of those assets in connection with the spinoff of Communications Sales & Leasing, Inc. (now known as Uniti Group, Inc.) in April 2015 constituted a Sale and Leaseback Transaction (as defined in the Indenture) which did not comply with the Sale and Leaseback covenant under the Indenture. The transactions did not constitute a Sale and Leaseback Transaction, and the Company asserts no

default occurred, and that no default is continuing, under the Sale
and Leaseback covenant under the Indenture.

142.     But the market was unconvinced.  Windstream's public disclosure of its receipt of
the Notice of Default had an unsurprising, immediate negative effect on both its own and *Uniti*'s
stock price.  On September 26, 2017, the first full trading day after Windstream filed its Form 8-
K, Uniti's stock price declined from $17.36 per share at the close of trading on September 25, 2019
to $15.66 per share at the close of trading on September 26, 2017, a decline of nearly 10%.  The
entirety of the decline can be attributed to Windstream's disclosure of the Notice of Default,
because no other material, company-specific information was disclosed that day.

143.     Uniti's stock price continued to decline on September 27, 2017, falling to $14.73,
a decline of another 5%.  Over the two-day period from September 25, 2017 to September 27,
2017, Uniti's stock price declined over 15%.  The entirety of this decline can also be attributed to
Windstream's disclosure of the Notice of Default, because, again, no other material, company-
specific information was disclosed on those days.  By the end of that month, Uniti's stock price
dropped still further, to $14.60 on September 29, 2017.

144.     Aurelius, in its capacity as "Directing Holder" of the Notes, instructed U.S. Bank,
as Trustee, to file the Indenture Litigation, alleging that the 2015 Uniti Spinoff and associated sale-
leaseback transaction violated the Indenture.  The Trustee filed the action in the United States
District Court for the Southern District of New York on October 12, 2017.  Windstream then
brought Aurelius into the case by asserting various counterclaims against both Aurelius and the
Trustee.  In part, Windstream sought injunctive relief to prevent the Trustee and Aurelius from
declaring an Event of Default under the Indenture.

145.     Uniti was noticeably silent for nearly six weeks following Aurelius's notice of
default.  But when Uniti finally spoke, rather than choosing candor, it attempted to continue to

mislead investors.  Even though the risk of a Windstream default was now known by the market, Uniti downplayed the magnitude of that risk.  In its Form 10-Q for 3Q 2017, filed on November 2, 2017, Uniti spoke in relatively measured terms about the Notice of Default, but did not reveal that it had been aware of the risk of default from the beginning:

> On September 22, 2017, Windstream Services, LLC ("Windstream Services"), Windstream's primary operating subsidiary, received a purported notice of default dated September 21, 2017 from a large purported holder of Windstream Services' 6 3/8% Senior Notes due 2023 (the "Windstream Notes"). The notice alleged, among other things, that Windstream Services violated certain restrictive covenants of the indenture governing the Windstream Notes in connection with Windstream's Spin-Off of Uniti Group. Windstream is challenging the alleged default in federal court and recently launched an exchange offer and consent solicitation to obtain a waiver of the alleged default from holders representing a majority of the aggregate principal amount of the Windstream Notes. If the alleged defaults claimed by the noteholder are not waived, the noteholder or the Windstream Notes' trustee may allege that an "event of default" has occurred under the Windstream Notes' indenture. An actual "event of default" would permit the Windstream Notes' trustee or holders of at least 25% in aggregate principal amount of outstanding of the Windstream Notes to declare the principal amount of all outstanding Windstream Notes to be immediately due and payable. Such an outcome would trigger cross-default provisions in Windstream's other debt instruments, including Windstream Services existing credit facility, which, in turn, would trigger a default under the Master Lease. In addition, Windstream Services' ability to pay dividends to Windstream Holdings under the terms of its indentures is subject to certain conditions, including the absence of a default or event of default, and any actual default or event of default could prevent Windstream Services from providing sufficient funding to Windstream Holdings to make payments on the Master Lease. Accordingly, we monitor the credit quality of Windstream through numerous methods, including by (i) reviewing the credit ratings of Windstream by nationally recognized credit rating agencies, (ii) reviewing the financial statements of Windstream that are publicly available and that are required to be delivered to us pursuant to the Master Lease, (iii) monitoring news reports regarding Windstream and its businesses, (iv) conducting research to ascertain industry trends potentially affecting Windstream, and (v) monitoring the timeliness of its lease payments.

146.     Just a few days later, at the November 7, 2017 Wells Fargo Media & Telecom Conference, Kenny Gunderman was less measured, assuring the market that the risk of a Windstream default would never materialize: "We've looked very, very closely at the legal claim, and we're very confident that the legal arguments are on Windstream's side.  So [we] think that that's going to resolve itself."

147.     To no one's surprise, Kenny Gunderman's public statements were consistent with the statements that Windstream's leadership, who denied any violation of the restrictive covenants, were making about the Notice of Default and the Indenture Litigation.  But Windstream's out-of-court conduct told a different story.  Windstream began executing a plan "to neutralize Aurelius" by "quietly exchang[ing] investors out of other bond tranches (with exit consents) into 6.375% notes due 2023 (with entry consents)."   Windstream's plan was to create a new majority of noteholders that could outvote Aurelius and waive any default that the 2015 Uniti Spinoff had triggered.  On October 5, 2017, Windstream's Board passed a formal resolution authorizing its management to execute this transaction "to address the allegations" in the Notice of Default.

148.     Buoyed by Kenny Gunderman's and Uniti's positive statements concerning the Indenture Litigation, Uniti's stock price reversed its decline.  From November 7, 2017 through February 15, 2019, the stock price increased by over 14%, from $16.53 to $19.98.

149.     But Windstream's plan to neutralize Aurelius failed, as did Windstream's legal defense.  On February 15, 2019, Judge Jesse Furman of the Southern District of New York determined that the spinoff and signing of the Master Lease breached the Indenture.  The court concluded that "[Windstream's] financial maneuvers – and many of its arguments [in the Court proceeding] – are too cute by half."  The court ruled, among other things, that the fact that the

Windstream operating subsidiaries used and paid for all their former assets "walks like a lease and talks like a lease … because it is a lease."

150.    Remarkably, the court even went the additional step of holding that Windstream was "judicially estopped from denying that the [Windstream operating subsidiaries] 'lease' the [assets transferred to Uniti]."  The court explained, "having benefitted from repeated statements to state regulators that the [Windstream operating subsidiaries] would lease back the [assets transferred to Uniti], [Windstream] is estopped from now denying that the [Windstream operating subsidiaries] did in fact lease those assets—even if doing so would not serve its interests."

151.    With this strong rebuke, the court declared over $300 million of Notes due and payable.  Looking back, if the "HoldCo" and "Captive" workaround appeared too good to be true, it is because it was.

152.    The market's reaction to Judge Furman's order was swift and severe.  On the next trading day after the order, Uniti's stock price declined over 37%, from $19.98 on February 15, 2019 to $12.51 on February 19, 2019.  The entirety of the decline can be attributed to the Windstream default, as there was no other material, company-specific news disclosed to the market.

153.    Over the next three days, Uniti's stock price declined still further, to a closing value of $9.23 on February 22, 2019.  That amounted to a total decline from the February 15, 2019 closing price of over 53%, all of which can be attributed to the Windstream default.

154.    Although Uniti's stock price rebounded partially on February 25, 2019, that same day, Windstream Holdings (and all its subsidiaries) filed for Chapter 11 bankruptcy protection. As a result of Windstream's bankruptcy, Uniti's stock price declined more than 9% over the next three trading days.

155.     As of the close of trading on the day prior to the filing of the original Complaint in this matter, Uniti's stock price was trading at $9.29 per share, and SLF's $65 million in Uniti stock equivalents were worth approximately $23.5 million.  Uniti's stock has depreciated even further since then, for the reasons explained below.  With Uniti stock trading at $7.20 per share on November 15, 2019, SLF's $65 million in Uniti stock equivalents are now worth approximately $18.5 million, a decline of approximately 71% from their value at the time of closing.

156.     But more deflation may be coming.  Uniti currently faces extreme risks to its ability to operate as a going concern, including a risk that Uniti itself will file a bankruptcy petition.  Uniti's bankruptcy risk arises because Windstream has the right, in its bankruptcy, to decide whether to reject the Master Lease with Uniti.  While Uniti has continually tried to spin a Master Lease rejection as unlikely to impossible, Windstream recently made it clear that a challenge to the Master Lease structure is very much on the table, suing Uniti in an Adversary Proceeding to re-characterize the Master Lease and associated transactions as a financing.

### Windstream's Adversary Proceeding in its Bankruptcy

157.     Windstream's attempt to re-characterize the Master Lease and associated transactions as a financing in the bankruptcy are of tremendous import to Uniti.  During the months leading up to the 2015 Uniti Spinoff, Windstream was regularly questioned about the ability of the Master Lease to protect Uniti's revenue in the event of a Windstream bankruptcy.  Windstream repeatedly made assurances then, as Uniti still does today, that the Master Lease cannot, as a practical matter, be rejected by Windstream in bankruptcy.  The reasoning is that, in bankruptcy, a "true lease" comes with an all-or-nothing election that Windstream would have to make, which would require it to accept the lease in its entirety or reject it in its entirety.  If Windstream rejected the lease in its entirety, it would, as a practical matter, be unable to continue to operate.

158.     However, if the Master Lease were recharacterized as a financing arrangement, that all-or-nothing election is no longer applicable, and Windstream would have the ability to "cram down" material changes to the financial arrangement between Uniti and Windstream (meaning Windstream could restructure payment terms over Uniti's objection) in ways that could materially impact Uniti's revenues and long-term strategic plans.  With all this in mind, the "true lease" determination is essential to any Uniti investor, and any risks that touch upon the essence of the true lease opinion are material to SLF.  As has been discussed above, the inflated useful life projections for the assets Windstream transferred to Uniti are critical to the "true lease" opinion.

159.     Now, revealing the unsupportable, inflated projections of the useful life of copper, Windstream has sued Uniti in an Adversary Proceeding to re-characterize the Master Lease and associated transactions as a financing.  In that proceeding, Windstream lays out, in detail, the scheme it and Uniti participated in to effectuate the 2015 Uniti Spinoff, including the back-filled financial terms of the lease through the "negotiation" of above-market lease payments based on unsupportable and unreasonable projections of copper's useful life (and thus the value of all the assets transferred).  Because Uniti currently derives the vast majority of its income from Windstream under the Master Lease, a termination or reduction of that lease would likely force Uniti into bankruptcy, potentially wiping out all equity, or would, at best, have a long-term negative impact on Uniti's stock price.

160.     Windstream has been clear about the stakes to Uniti if Windstream succeeds in its current effort in the adversary proceeding in its bankruptcy.  According to Windstream, "if [the Master Lease is] recharacterized as what it is – a financing – Uniti's resulting claim would be almost entirely unsecured and structurally subordinated.  Because of recharacterization, the excessive rent payments [to Uniti] would cease…."

56

161.    Uniti's ability to continue as a going concern has been called into question by the revelation of the fraud, the Windstream bankruptcy, and the threat of recharacterization of the Master Lease.  In its Form 10-K filing for the year ended December 31, 2018, Uniti disclosed that its outside auditors, PricewaterhouseCoopers LLP, "expressed substantial doubt as to whether we could continue as a going concern within one year after the date the financial statements are issued as a result of Windstream's bankruptcy petition and the bankruptcy's uncertain effects on the Master Lease."

162.    Furthermore, although Uniti was aware of the risk that the Master Lease could be recharacterized as a financing arrangement, it failed to take all necessary steps to perfect its interest as a secured creditor against Windstream and its subsidiaries.  As a result, if Windstream prevails on all claims pending in the Bankruptcy Court, not only will the majority of the $9 billion in enterprise value Uniti presented to SLF in October 2016 evaporate, Uniti will not have title or a security interest in the very assets that were the basis of the bargain for SLF to accept stock from Uniti as part of the sale transaction.  Instead, Uniti will merely have an unsecured claim in Windstream's bankruptcy.

163.    The true extent of the risks of recharacterization were never disclosed to SLF as part of the negotiations leading up to the 2017 Transaction.

164.    Windstream's recent filings in its bankruptcy refer to the Master Lease structure as a "fig leaf" and state that Windstream knew all along that re-characterization was a risk.  When Windstream avers that re-characterization was a known risk all along, John Fletcher, Windstream's General Counsel and leader of the "Windstream Group" that negotiated the Master Lease, and Kenny Gunderman, Windstream's investment banker and the original architect of the non-traditional REIT structure in the first place, are also charged with that knowledge.  When Uniti

and Kenny Gunderman made representations to SLF in the negotiations to purchase Southern Light, their representations to SLF and their duty to speak fully were undertaken against the backdrop of their knowledge of the true risks of the investment they were pushing on SLF.

165.    The revelation of the true extent of the risk that the Master Lease was not a lease at all, but instead a financing, along with the possibility that Windstream may reject the Master Lease regardless, have had a dramatic, negative effect on Uniti's stock price.  On June 19, 2017, the day before various Windstream creditors first raised the possibility in the Windstream bankruptcy that the Master Lease was a financing, rather than a lease, Uniti's stock price traded at $9.69 per share. Since then, however, the stock price has declined more than 25%, falling to $7.20 per share on November 15, 2019, the last trading day before this Amended Complaint was filed.  Most, if not virtually all, of this decline in Uniti's stock price can be attributed to the revelation of the risk that the Master Lease will be recharacterized as a financing, along with developments within the Windstream bankruptcy that impact the likelihood of that risk materializing and the likelihood that Windstream may otherwise reject the Master Lease or stop making rental payments.

## V.    SLF's Attempts to Resolve the Dispute

166.    SLF's review of the Southern District of New York's decision raised serious concerns about Windstream's and Uniti's viability as ongoing businesses.  Those concerns were exacerbated by the fact that the same officers who led Windstream and Uniti in the court-maligned spinoff structure and entry into the Master Lease were still in top leadership roles at both companies—especially brothers Kenny Gunderman, CEO at Uniti, and Bob Gunderman, CFO at Windstream.  And both companies publicly downplayed or ignored the issues that Judge Furman identified.

167.    As a result, SLF wrote a letter to Uniti's independent directors in April 2019 requesting that they (i) identify and address management conflicts to ensure objective leadership handles all ongoing and future discussions about Uniti's future, (ii) appoint a special committee of independent directors with no prior relationships with Windstream to conduct a full, impartial investigation into the interactions (and inactions) of both Windstream and Uniti related to the spinoff of Uniti, and (iii) schedule an in-person meeting with SLF to further discuss the situation and SLF's specific requests.  Uniti declined all requests.

168.    Now the very people who erected this "house of cards" in the first place – notably including Tony Thomas and Bob Gunderman – are setting about to dismantle their creation, seeking a court order declaring the Master Lease to be a financing, ending the stream of rent payments to Uniti and sticking it with an unsecured claim in the Windstream bankruptcy, and declaring that the assets that were the heart of the 2015 Uniti Spinoff were never actually transferred at all.

### Count I – Fraud in the Inducement
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)**

169.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

170.    As detailed above, during SLF's negotiations with Uniti, Uniti Fiber and Kenny Gunderman represented to SLF that the 2015 Uniti Spinoff was a cutting-edge transaction that placed it at as an industry leader.  Uniti, Uniti Fiber, and Kenny Gunderman urged SLF to accept Uniti stock equivalents, rather than to proceed with SLF's preferred all-cash transaction because of Uniti's financial strength and the market statement a partial-stock transaction would make.

171.    At the same time, Uniti, Uniti Fiber, and Kenny Gunderman knew, should have known, or acted with reckless disregard for the facts that (1) the 2015 Uniti Spinoff and associated

sale-leaseback transaction violated Windstream's indenture covenants; (2) the 2015 Uniti Spinoff and associated sale-leaseback transaction placed Windstream at risk of violating the Indenture's restrictive covenants; and (3) Windstream had told state regulators that the spinoff would result in a leaseback to the Windstream operating subsidiaries.

172.    Uniti, Uniti Fiber, and Kenny Gunderman also knew, should have known, or acted with reckless disregard for the facts that (1) the Master Lease that provided over 80% of Uniti's income was subject to a risk of recharacterization as a financing; (2) the material facts and projections underlying the conclusions that the Master Lease would be treated for tax purposes as a "true lease" were inflated and not credible; (3) if characterized as a financing, the Master Lease would cause Windstream to violate the debt ratio covenant in the Indenture; and (4) the recharacterization of the Master Lease as a financing would jeopardize the payments to Windstream that constituted substantially all of Uniti's enterprise value, as well as the continuing ability of Uniti to be treated as a REIT for tax purposes.

173.    Uniti, Uniti Fiber, and Kenny Gunderman also knew, should have known, or acted with reckless disregard for the facts that (1) the IRS private letter ruling permitting Uniti to exist as a REIT with nontraditional real estate assets was based in part on Windstream's representation to the IRS that the useful life of the copper wires that made up approximately 80% of the assets to be spun off to Uniti was 30 to 40 years, in contravention of other analyses that Windstream possessed at the time and, on information and belief based upon the allegations of Windstream's complaint in the Adversary Proceeding, in contravention of Windstream's own accounting policy of depreciating copper wire assets in its Competitive Local Exchange Carrier networks over 20 years; (2) the projections of useful life of copper wire networks that Uniti provided to E&Y, and that Skadden in turn relied on in providing its "true lease" opinion letter, were inflated and not

credible, and in contravention of other analyses that Uniti, Uniti Fiber, and Kenny Gunderman knew or should have known about; and (3) the inflated projections of useful life were critical to maintaining the Master Lease's status as a "true lease" and, in turn, Uniti's status as a REIT.  The inflated useful life for copper wire assets was the foundation of a "house of cards" that was erected via the 2015 Uniti Spinoff, but the risks that the structure could collapse due to the inflated useful life of copper wire assets were undisclosed by Uniti, Uniti Fiber, and Kenny Gunderman.  The risks inherent in the structure due to the poor foundation have been revealed in the Windstream bankruptcy.

174.    Uniti, Uniti Fiber, and Kenny Gunderman elected to speak about the 2015 Uniti Spinoff, and induced SLF to accept a partial-stock transaction that ultimately would include stock in Uniti.

175.    Once Uniti, Uniti Fiber, and Kenny Gunderman elected to speak about the 2015 Uniti Spinoff, and induced SLF to accept membership interests in Uniti Group LP exchangeable for common stock of Uniti Group, Inc., they assumed a duty to provide a full and accurate disclosure about the risks of the spinoff transaction, including without limitation the risk that the transaction was a prohibited sale-leaseback transaction and the risk that the Master Lease could be recharacterized as a financing and the risk that the underlying inflated useful life of copper wire assets could cause the whole REIT structure and the Master Lease to be called into question, and not to suppress or conceal facts that materially qualified the representations that it made to SLF about the spinoff, the strength of the Master Lease, Uniti's structure as a REIT, and the "iron-clad" dividend Uniti would pay.

176.    Uniti's public filings also gave rise to a duty to disclose its knowledge that—or its knowledge of the material risk that—the 2015 Uniti Spinoff violated the Indenture.  Uniti's, Uniti

Fiber's and Kenny Gunderman's public statements characterized Windstream Holdings as the lessee under the Master Lease, touted Windstream and its financial condition, expressed a willingness to engage in additional sale-leaseback transactions with Windstream in the future, explained that Uniti was dependent on Windstream and that Uniti management was taking steps to monitor Windstream's viability, and described the company's outlook after the 2015 Uniti Spinoff.  These statements about Uniti's relationship with Windstream and Windstream's financial viability were materially misleading for failing to disclose that the Windstream operating entities were the *de facto* lessees of the copper and fiber network assets, and the risk that the 2015 Uniti Spinoff and sale-leaseback violated the Indenture's restrictive covenant, which would impair Windstream's ability to operate as a going concern.

177.    In the alternative, Uniti's, Uniti Fiber's, and Kenny Gunderman's statements about Uniti's relationship with Windstream and Windstream's financial viability were materially misleading because they did not disclose that the purported Master Lease was not a true lease but was instead a financing, that the assets purportedly transferred to Uniti in the 2015 Uniti Spinoff were actually still owned by Windstream's operating subsidiaries, that the Master Lease's true nature as a financing risked violation of the Indenture's debt ratio covenant and jeopardized Uniti's ability to continue to be treated as a REIT for tax purposes, all of which made an investment in Uniti a much riskier proposition.

178.    Uniti's, Uniti Fiber's, and Kenny Gunderman's knowledge of the material risk that the 2015 Uniti Spinoff placed Windstream in violation of the Indenture's restrictive covenants, that Windstream had engaged in prohibited sale-leaseback transactions or alternatively that it had engaged in a prohibited financing transaction, that violating the Indenture would financially cripple Windstream, and that Uniti's financial strength depended on Windstream's viability together

materially qualified its earlier representations about the 2015 Uniti Spinoff and representations inducing SLF to accept partial-stock consideration.

179.    Uniti, Uniti Fiber, and Kenny Gunderman negligently or recklessly failed to disclose, or deliberately concealed, these material facts from SLF to induce it to consummate the 2017 Transaction and to accept partial-stock consideration.

180.    Had SLF known the true state of affairs about Uniti's financial position, its reliance on Windstream as a primary source of revenue, and the potential risks that Windstream faced as a result of the 2015 Uniti Spinoff, SLF would not have entered into the Purchase Agreement and would not have accepted Uniti stock equivalents.

181.    Uniti, Uniti Fiber, and Kenny Gunderman represented to SLF, including in Section 4.3 of the Purchase Agreement. that Uniti had obtained all necessary consents to enter into the 2017 Transaction.  Schedule 4.3 of the Purchase Agreement listed the consents Uniti had received.

182.    Uniti, Uniti Fiber, and Kenny Gunderman also represented to SLF, including in Section 4.4 of the Purchase Agreement, that neither the execution of the Purchase Agreement nor the consummation of the 2017 Transaction would constitute a material violation of, or create a material default under, any material agreement to which Uniti was a party, including without limitation the Master Lease.

183.    But Uniti, Uniti Fiber, and Kenny Gunderman knew or recklessly disregarded the fact that at the time that they made the representations that are reflected in Sections 4.3 and 4.4 of the Purchase Agreement, those representations were false.  In fact, neither Uniti nor Uniti Fiber had received consent from Windstream to enter into the 2017 Transaction and purchase the membership interests of Southern Light.  Windstream now asserts in its bankruptcy that its consent to the 2017 Transaction was necessary, but that it was never sought and never given.  Windstream

further asserts in its bankruptcy that Southern Light was a Competitor of Windstream, as the term "Competitor" is defined in the Master Lease, and that Uniti violated the Master Lease by entering into the transaction whereby it purchased Southern Light.

184.    Had SLF known that Uniti had not received all necessary consents to enter into the 2017 Transaction, and that, absent consent, entering into the 2017 Transaction would be considered a breach of the Master Lease, SLF would not have executed the Purchase Agreement and would not have accepted Uniti stock equivalents as partial consideration for the sale of Southern Light membership interests.[7]

185.    As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's misrepresentation and fraudulent suppression of material facts, SLF was induced to act to its detriment by entering into a contract for the sale of Southern Light and accepting Uniti stock equivalents.

186.    As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's misrepresentation and fraudulent suppression and concealment of material facts, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti stock equivalents and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, punitive damages, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

---

[7] SLF reserves all rights to assert, or to demand that Uniti and/or Uniti Fiber assert on SLF's behalf, any and all available claims under the R&W Insurance Policy referenced in the Purchase Agreement arising from Uniti's and Uniti Fiber's breach of Section 4.3 and Section 4.4 of the Purchase Agreement.

## Count II – Conspiracy
### (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., Kenny Gunderman, and John P. Fletcher)

187.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

188.    Uniti, Uniti Fiber, Kenny Gunderman, and Fletcher, along with Windstream, and Windstream's officers, directors, and employees, like Tony Thomas, engaged in concerted action to defraud potential investors like SLF. Windstream and Uniti combined to defraud SLF by misleading regulators and structuring the 2015 Uniti Spinoff in a way designed to avoid the Indenture's restrictive covenants, encouraging SLF to invest in Uniti, and failing to disclose material facts, including (1) Uniti's knowledge that the 2015 Uniti Spinoff and associated sale-leaseback transaction violated the Indenture's restrictive covenants; (2) Uniti's knowledge of the risk that the 2015 Uniti Spinoff placed Windstream in violation of the Indenture's restrictive covenants; (3) Windstream's knowledge that the IRS private letter ruling that allowed Uniti to exist as a REIT was based in part on Windstream's representation to the IRS that the useful life of the copper wires that made up approximately 80% of the assets to be spun off to Uniti was 30 to 40 years, in contravention of other analyses that Windstream possessed at the time and, on information and belief based upon the allegations of Windstream's complaint in the Adversary Proceeding, in contravention of Windstream's own accounting policy of depreciating copper wire assets in its Competitive Local Exchange Carrier networks over 20 years; (4) Uniti's knowledge that the projections of useful life of the assets that were spun off from Windstream were inflated and economically unsupportable and thus the Master Lease was at risk of not being a "true lease"; (5) Uniti's knowledge that the Master Lease was at risk of being recharacterized as a financing; and (6) Uniti's knowledge that violating the Indenture would financially cripple Windstream.

189.     Additionally, during the negotiation of the terms of the Master Lease, Fletcher, who was General Counsel of both Windstream and Uniti, was operating on both sides of the negotiation. Though formally designated a member of the "Windstream Group" during the negotiations, Fletcher's fiduciary duties to his clients on each side of the negotiating table were irreconcilably in conflict.  Fletcher could not simultaneously negotiate fair terms for Uniti as General Counsel of Uniti and fair terms for Windstream as General Counsel of Windstream.  The process of negotiation of the Master Lease was thus infected by Fletcher's breaches of fiduciary duty.  When Uniti, Uniti Fiber, and Gunderman approached SLF in the Southern Light transaction, they suppressed their knowledge of the material fact that the negotiation of the Master Lease was not an arm's length transaction.

190.     The object and purpose of this scheme was to defraud and induce investors like SLF to purchase Uniti securities.

191.     As a direct and proximate result of this conduct, SLF suffered damages, including, but not limited to, the loss of the value of membership interests in Uniti Group LP exchangeable for common stock of Uniti Group, Inc. and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, Kenny Gunderman and John P. Fletcher for actual, consequential, compensatory damages, punitive damages, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count III – Violations of the Alabama Securities Act (Ala. Code § 8-6-17(a)(1)) (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)

192.     SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

193.     Uniti, Uniti Fiber, and Kenny Gunderman made an offer to sell derivative interests in Uniti in the State of Alabama, and SLF accepted Uniti's offer to buy derivative interests in Uniti in the State of Alabama.

194.     The derivative interests in Uniti are securities.

195.     SLF owns securities of Uniti.

196.     Uniti, Uniti Fiber, and Kenny Gunderman employed a device, scheme, or artifice to defraud investors, including SLF.

197.     As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent scheme, SLF was induced to purchase Uniti securities to its ultimate detriment.

198.     As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent scheme, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

199.     As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent omission, SLF was induced to purchase Uniti securities to its ultimate detriment.

200.     As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's fraudulent omission, SLF suffered damages, including, but not limited to, the loss of the value its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count IV – Violations of the Alabama Securities Act (Ala. Code § 8-6-17(a)(2)) (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)

201.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

202.    Uniti, Uniti Fiber, and Kenny Gunderman made an offer to sell derivative interests in Uniti in the State of Alabama, and SLF accepted their offer to buy derivative interests in Uniti in the State of Alabama.

203.    The derivative interests in Uniti are securities.

204.    SLF owns securities of Uniti.

205.    Uniti, Uniti Fiber, and Kenny Gunderman made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

206.    SLF was induced to act based on the untrue or misleading statements of material fact and fraudulent omissions made by Uniti, Uniti Fiber, and Kenny Gunderman.

207.    As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's untrue statements of material fact and fraudulent omissions, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

**Count V – Violations of the Alabama Securities Act (Ala. Code § 8-6-17(a)(3))**
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)**

208.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

209.     Uniti, Uniti Fiber, and Kenny Gunderman made an offer to sell derivative interests in Uniti in the State of Alabama, and SLF accepted Uniti's offer to buy derivative interests in Uniti in the State of Alabama.

210.     The derivative interests in Uniti are securities.

211.     SLF owns securities of Uniti.

212.     Uniti, Uniti Fiber, and Kenny Gunderman engaged in an act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

213.     SLF was induced to act based on the untrue or misleading statements of material fact and fraudulent omissions made by Uniti, Uniti Fiber, and Kenny Gunderman.

214.     As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's untrue statements of material fact and fraudulent omissions, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count VI – Violations of the Alabama Securities Act (Ala. Code § 8-6-19(c)) (Against Kenny Gunderman and John P. Fletcher)

215.     SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

216.     As set forth above, Uniti and Uniti Fiber violated Section 8-6-19(a) of the Alabama Securities Act.

217.     Defendants Kenny Gunderman and John P. Fletcher are currently or were formerly officers and employees of Uniti and/or Uniti Fiber.

218.    While employed by Uniti and/or Uniti Fiber, Kenny Gunderman and Fletcher materially aided in the conduct giving rise to Uniti's and Uniti Fiber's liability under Alabama Code § 8-6-19(a).

WHEREFORE, SLF demands judgment in its favor and against Kenny Gunderman and Fletcher for actual, consequential, compensatory damages, attorneys' fees, costs, interest, and all such other, further, and different relief in law and equity as this Court may deem appropriate.

### Count VII – Violations of the Exchange Act (15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5(a)) (Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)

219.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

220.    SLF owns derivative interests in Uniti.  These derivative interests are securities.

221.    Uniti used a means or instrumentality of interstate commerce to effectuate the sale of securities to SLF.

222.    In connection with the sale of securities, Uniti, Uniti Fiber, and Kenny Gunderman, either directly or indirectly, employed a device, scheme, or artifice to defraud.

223.    As described above, Uniti, Uniti Fiber, and Kenny Gunderman knew that the structure of the 2015 Uniti Spinoff and Uniti's execution of the Master Lease with Windstream violated or risked violating the restrictive covenants in the Indenture.

224.    Uniti, Uniti Fiber, and Kenny Gunderman had a motive to hide the risks associated with the 2015 Uniti Spinoff and the Master Lease from investors like SLF.  The IRS private letter ruling that permitted Uniti to exist as a REIT in the first place was based in part on Windstream's representation to the IRS that the useful life of the copper wires that made up approximately 80% of the assets to be spun off to Uniti was 30 to 40 years, in contravention of other analyses that Windstream possessed at the time and, on information and belief based upon the allegations of

70

Windstream's complaint in the Adversary Proceeding, in contravention of Windstream's own accounting policy of depreciating copper wire assets in its Competitive Local Exchange Carrier networks over 20 years.  So too was the E&Y analysis of the useful life of the assets to be spun off to Uniti based on inflated and unsupportable projections provided by Uniti.  And Uniti knew that these projections were inflated and unrealistic; its own accounting for those assets carried them at a useful life of 7-40 years until 2017, when, without explanation the accounting treatment in its financial statements changed to a useful life of 20 years.  A useful life of 20 years or less would not support the "true lease" treatment of the Master Lease, which would in turn jeopardize the tax treatment of Uniti as a REIT.  None of this could withstand scrutiny, and so Uniti, Uniti Fiber, and Kenny Gunderman had every reason to hide it.

225.   Similarly, Uniti, Uniti Fiber, and Kenny Gunderman had immediate economic incentives to hide the risks associated with the 2015 Uniti Spinoff and the Master Lease from investors like SLF.  Windstream's financial viability depended on not defaulting on its Notes.  And Uniti's financial viability—as well as the employment and lucrative compensation package of Kenny Gunderman at Uniti and Bob Gunderman, his brother, at Windstream—in turn, depended on Windstream's continued success.  If it were publicly disclosed that Windstream violated—or had engaged in a transaction that risked violating—the Indenture and causing a default, the value of Uniti and its stock and stock equivalents would crater.  Moreover, Uniti, Uniti Fiber, and Kenny Gunderman knew that if they publicly identified the true nature of the risks that Windstream was in violation of the Master Lease, then they essentially would be inviting Windstream's note holders to do exactly what Aurelius did – cause the Indenture Trustee to file a breach of contract action against Windstream.  Only by concealing the true nature of these risks could Uniti and Windstream hope to possibly avoid the collapse of this "house of cards."

226.    Uniti's internal discussions confirm that this motive to attract investment while hiding the risks of the 2015 Uniti Spinoff from potential investors drove their misleading public disclosures.  Before the spinoff, Windstream's Vice President of Capital Markets and Investor Relations instructed executives that were intimately involved with the 2015 Uniti Spinoff "not [to] go into detail" unless "pressed" on why the lease would be implemented with Windstream Holdings.  And at Uniti, Kenny Gunderman's role was to "reinforce the message" about the viability of the 2015 Uniti Spinoff.  Even then, the "talking points" avoided any discussion of the existential risks to Windstream and Uniti that the spinoff and Master Lease posed.

227.    The facts stated above give rise to a strong inference that Uniti, Uniti Fiber, and Kenny Gunderman acted with scienter.

228.    SLF relied on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman in purchasing securities.

229.    As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's untrue statements and omissions of material facts, SLF was induced to purchase Uniti securities to its ultimate detriment.

230.    As a direct and proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's untrue statements and omission of material facts, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

**Count VIII – Violations of the Exchange Act (15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5(b))**
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)**

231.     SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

232.     SLF owns derivative interests in Uniti.  These derivative interests are securities.

233.     Uniti used a means or instrumentality of interstate commerce to effectuate the sale of securities to SLF.

234.     In connection with the sale of securities, Uniti, Uniti Fiber, and Kenny Gunderman, either directly or indirectly, made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

235.     The facts stated above give rise to a strong inference that Uniti, Uniti Fiber, and Kenny Gunderman acted with scienter.

236.     SLF relied on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman in purchasing securities.

237.     As a proximate result of Uniti's, Uniti Fiber's and Kenny Gunderman's untrue statements and omissions of material facts, SLF was induced to purchase Uniti securities to its ultimate detriment.

238.     As a direct and proximate result of Uniti's, Uniti Fiber's, and Kenny Gunderman's untrue statements and omissions of material facts, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

**Count IX – Violations of the Exchange Act (15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5(c))**
**(Against Uniti Group, Inc., Uniti Fiber Holdings, Inc., and Kenny Gunderman)**

239.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

240.    SLF owns derivative interests in Uniti.  These derivative interests are securities.

241.    Uniti used a means or instrumentality of interstate commerce to effectuate the sale of securities to SLF.

242.    Uniti, Uniti Fiber, and Kenny Gunderman, either directly or indirectly, engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon a person, in connection with the purchase or sale of any security.

243.    The facts stated above give rise to a strong inference that Uniti, Uniti Fiber, and Kenny Gunderman acted with scienter.

244.    SLF relied on the untrue or misleading statements made by Uniti, Uniti Fiber, and Kenny Gunderman in purchasing securities.

245.    As a proximate result of Uniti's, Uniti Fiber's, and Kenny Gunderman's untrue statements and omissions of material facts, SLF was induced to purchase Uniti securities to its ultimate detriment.

246.    As a direct and proximate result of Uniti's, Uniti Fiber's, and Kenny Gunderman's untrue statements and omission of material facts, SLF suffered damages, including, but not limited to, the loss of the value of its Uniti securities and the costs of this action.

WHEREFORE, SLF demands judgment in its favor and against Uniti, Uniti Fiber, and Kenny Gunderman for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

## Count X – Violations of the Exchange Act (15 U.S.C. § 78t)
### (Against Kenny Gunderman)

247.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

248.    As described above, Uniti and Uniti Fiber committed violations of federal securities laws.  Kenny Gunderman violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.   Kenny Gunderman also knowingly or recklessly provided substantial assistance to Uniti's and Uniti Fiber's violations of Section 10(b) and Rule 10b-5 and knowingly or recklessly provided substantial assistance to violations of Section 10(b) and Rule 10b-5 by directing the fraudulent scheme identified in this Complaint.

249.    Kenny Gunderman, as President and CEO of Uniti and Uniti Fiber, and with knowledge of the details of Windstream's maneuvers in an attempt to give the appearance of not violating the Indenture's restrictive covenants, is a control person with the power to control Uniti's statements and omissions of material facts.  Kenny Gunderman actually did control Uniti's and Uniti Fiber's untrue statements and omissions of material facts.

250.    By reason of the foregoing, Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), deems Kenny Gunderman to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Uniti and Uniti Fiber to whom such assistance was provided.

WHEREFORE, SLF demands judgment in its favor and against Kenny Gunderman, for actual damages and all such other, further, and different relief in law and equity as this Court may deem appropriate.

## Count XI – Declaratory Judgment for Indemnification
### (Against Uniti Group, Inc.)

251.    SLF adopts, references, incorporates, and re-alleges all factual allegations set forth above.

252.    SLF seeks a declaratory judgment that it is entitled to indemnification from Uniti under the Purchase Agreement.

253.    As set forth above, Uniti had a contractual obligation under Section 5.23 of the Purchase Agreement to file a true and accurate Prospectus supplement on July 3, 2017.

254.    Uniti promised that the Prospectus supplement would "not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading."

255.    Uniti breached its contractual obligations and violated the Exchange Act and the Alabama Securities Act by filing a Prospectus supplement that contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

256.    As a direct and proximate result of Uniti's breach of Section 5.23 of the Purchase Agreement and resultant violations of the Exchange Act and Alabama Securities Act, SLF was damaged.

257.    Pursuant to Section 5.23(d) of the Purchase Agreement, Uniti has an obligation to indemnify SLF for its damages resulting from Uniti's foregoing breach of Section 5.23 of the Purchase Agreement and resultant violations of the Exchange Act and Alabama Securities Act.

258.    An actual, present, and justiciable controversy has arisen between SLF and Uniti concerning Uniti's obligation to indemnify SLF for Uniti's breach of Section 5.23 of the Purchase Agreement.

WHEREFORE, SLF demands the entry of a declaratory judgment in its favor and against Uniti for indemnification for SLF's actual, consequential, compensatory damages, attorneys' fees and costs, interest, and all such other, further, and different relief in law and equity resulting from Uniti's breach of Section 5.23 of the Purchase Agreement as this Court may deem appropriate.

### Prayer for Relief

WHEREFORE, SLF demands judgment in its favor and against Defendants for the following:

1.      Actual, compensatory, and consequential damages including, but not limited to, the damages proximately caused as a result of the fraud by Uniti, Uniti Fiber, Kenny Gunderman, and John Fletcher; attorneys' fees and costs; and other legally recoverable damages under the Purchase Agreement;

2.      A declaration that Uniti must indemnify SLF for its actual, consequential, compensatory damages, attorneys' fees and costs, and other legally recoverable damages resulting from Uniti's breach of its covenant in Section 5.23 of the Purchase Agreement;

3.      Reformation of the Purchase Agreement to an all-cash deal for $700 million;

4.      Punitive damages as a result of the fraudulent, intentional, willful, and wanton conduct by Uniti, Uniti Fiber, Kenny Gunderman, and John Fletcher; and

5.      All such other, further and different relief in law and equity as this Court may deem just and appropriate.

Dated:  November 18, 2019

OF COUNSEL:

Edward S. Sledge IV
Dylan C. Black
Zachary A. Madonia
Emily M. Ruzic
Stanley E. Blackmon
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Phone: (205) 521-8000
Fax: (205) 521-8800
esledge@bradley.com
dblack@bradley.com
zmadonia@bradley.com
eruzic@bradley.com
sblackmon@bradley.com

BAYARD, P.A.

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (#4952)
Emily A. Letcher (#6560)
600 N. King Street, Suite 400
P.O. Box 25130
Wilmington, Delaware 19801
(302) 655-5000
sbrauerman@bayardlaw.com
eletcher@bayardlaw.com

*Attorneys for Plaintiff SLF Holdings, LLC*